1  SETH P. WAXMAN (*pro hac vice*)
   seth.waxman@wilmerhale.com
2  PATRICK J. CAROME (*pro hac vice*)
   patrick.carome@wilmerhale.com
3  ARI HOLTZBLATT (*pro hac vice*)
   ari.holtzblatt@wilmerhale.com
4  WILMER CUTLER PICKERING
     HALE AND DORR LLP
5  1875 Pennsylvania Avenue, NW
6  Washington, D.C. 20006
   Telephone:  (202) 663-6000
7  Facsimile:  (202) 663-6363

8
   MARK D. FLANAGAN (CA SBN 130303)
9  mark.flanagan@wilmerhale.com
   WILMER CUTLER PICKERING
10    HALE AND DORR LLP
   950 Page Mill Road
11 Palo Alto, California  94304
   Telephone:  (650) 858-6000
12 Facsimile:  (650) 858-6100

13 *Attorneys for Defendant*
   **TWITTER, INC.**
14
15                UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
16

17 ANNE CAMERON CAIN, BEATRIZ          Case No. 3:17-cv-02506-JD
   GONZALEZ, JOSE HERNANDEZ, REY
18 GONZALEZ, PAUL GONZALEZ, and        **NOTICE OF MOTION AND MOTION**
   REYNALDO GONZALEZ,                  **OF DEFENDANT TWITTER, INC. TO**
                                       **DISMISS THE AMENDED COMPLAINT**
19                                     **PURSUANT TO FED. R. CIV. P. 12(b)(6);**
              Plaintiffs,              **MEMORANDUM OF POINTS AND**
20                                     **AUTHORITIES IN SUPPORT THEREOF**
           v.
21
                                       Date:    September 14, 2017
22 TWITTER INC.,                       Time:   10:00 a.m.
                                       Courtroom:    11, 19th floor
23            Defendant.
24                                     Judge: Hon. James Donato
25                                     [Fed. R. Civ. P. 12(b)(6)]
26
27
28

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................. ii

NOTICE OF MOTION AND MOTION ............................................................................1

STATEMENT OF REQUESTED RELIEF .........................................................................1

STATEMENT OF ISSUES TO BE DECIDED ..................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES .....................................................1

STATEMENT OF FACTS ..................................................................................................1

LEGAL STANDARDS ON A MOTION TO DISMISS .....................................................2

ARGUMENT ......................................................................................................................5

I.      Section 230 Requires Dismissal Of All Of Plaintiffs' Claims ...............................5

        A.      Section 230 Immunizes Twitter From Liability For Third-Party
                Content .......................................................................................................5

        B.      Plaintiffs' Claims Meet All Elements Of § 230 Immunity .......................6

                1.      Twitter's Platform Is An "Interactive Computer Service" .........6

                2.      Third Parties Provided The Allegedly Harmful Content
                        Underlying Plaintiffs' Claims ....................................................7

                3.      Plaintiffs' Claims Seek To Treat Twitter As A Publisher .........9

II.     All Of Plaintiffs' Claims Also Independently Fail On Their Own Terms.........................11

        A.      Plaintiffs' Secondary Liability Claims Fail (Counts I-II) .....................11

        B.      Plaintiffs' Direct Liability Claims Fail (Counts III-VI).........................13

                1.      Twitter Committed No "Act Of International Terrorism"
                        (Counts III-IV) ........................................................................13

                2.      Twitter Did Not Proximately Cause The Attacks
                        (Counts III-VI) ........................................................................14

CONCLUSION..................................................................................................................15

CERTIFICATE OF SERVICE

## **TABLE OF AUTHORITIES**

Page(s)

### **CASES**

*Airbnb, Inc. v. City & Cty. of San Francisco*, 2016 WL 6599821 (N.D. Cal. Nov. 8, 2016) ................................................................................................5

*Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450 (E.D.N.Y. 2011)....................................8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................5, 12

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009)..........................................5, 6, 9

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003)..........................................8, 11

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc)................................................................................................14

*Brill v. Chevron Corp.*, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017)................................13

*Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016) ............................6

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003)........................6, 7, 8

*Cohen v. Facebook, Inc.*, 2017 WL 2192621 (E.D.N.Y. May 18, 2017) ...............1, 6, 8, 9, 10, 11

*Coto Settlement v. Eisenberg*, 593 F.3d 1031 (9th Cir. 2010) ........................................4

*Dillon v. Legg*, 441 P.2d 912 (Cal. 1968) ..............................................................14

*Doe v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016)........................................6, 7

*Doe v. Bates*, 2006 WL3813758 (E.D. Tex. Dec. 27, 2006) ........................................6

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) ..............................................10

*Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008) (en banc)..................................................2, 5, 6, 7, 8, 9

*Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016)........................1, 6, 7, 9, 10, 11, 12

*Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016)..........................1, 6, 9, 10, 11, 15

*Gilbrook v. City of Westminster*, 177 F.3d 839 (9th Cir. 1999)....................................13

*Goddard v. Google, Inc.*, No. C 08-2738, 2008 WL 5245490 (N.D. Cal. Dec. 17, 2008) ................................................................................................8

---

*Haft v. Lone Palm Hotel*, 478 P.2d 465 (Cal. 1970) ..................................................................14

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...........................................................12, 13

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010) ........................................................15

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992) ...........................................................14

*In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049 (9th Cir. 2008) ........................................................5

*In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013).................................14, 15

*In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765 (S.D.N.Y. 2005),
     *aff'd*, 714 F.3d 118 (2d Cir. 2013) ....................................................................................14

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) ................................8

*Kimzey v. Yelp! Inc.*, 836 F.3d 1263 (9th Cir. 2016) ....................................................................5

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) ........................................................5, 6

*Levitt v. Yelp! Inc.*, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) ..............................................8

*M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041
     (E.D. Mo. 2011) ..............................................................................................................8

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009).....................5

*O'Kroley v. Fastcase, Inc.*, 831 F.3d 352 (6th Cir. 2016) ............................................................8

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015).......................................................................11

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ...........................................................13, 14, 15

*Stansell v. BGP, Inc.*, No. 09-CV-2501, 2011 WL 1296881 (M.D. Fla. Mar. 31,
     2011) ............................................................................................................................13

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007).................................10

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)........................................................6

## STATUTES

18 U.S.C. § 2331.................................................................................................1, 2, 13, 14

18 U.S.C. § 2333..................................................................................1, 2, 4, 9, 12, 13, 14, 15

18 U.S.C. § 2339A...................................................................................................4, 13, 15

18 U.S.C. § 2339B...................................................................................................5, 13, 15

47 U.S.C. § 230...................................................................................1, 5, 6, 7, 8, 9, 10, 11

Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222..........................................11, 12

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on September 14, 2017, at 10 a.m. in the United States District Court for the Northern District of California, Courtroom 11, 450 Golden Gate Ave., San Francisco, California, Defendant Twitter, Inc. shall and hereby does move for an order dismissing with prejudice all claims in the First Amended Complaint ("FAC"), Dkt. 15.

## STATEMENT OF REQUESTED RELIEF

Twitter requests the Court dismiss all of Plaintiffs' claims without further leave to amend.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether 47 U.S.C. § 230 bars this action, which seeks to hold Twitter liable for allegedly failing to block or remove third-party content transmitted via Twitter's platform.

2.      Whether Plaintiffs' claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and state law must be dismissed for failure to allege facts that would establish that Twitter (a) knowingly assisted or conspired with the "person[s] who committed" the Paris and Brussels attacks, *id.* § 2333(d) (Counts I-II); (b) committed an act of "international terrorism," *id.* § 2331(1) (Counts III-IV), and (c) proximately caused Plaintiffs' injuries (Counts III-VI).

## MEMORANDUM OF POINTS AND AUTHORITIES

The FAC seeks to hold Twitter liable for the deaths of two persons killed in attacks in Paris and Brussels committed by terrorists affiliated with the Islamic State of Iraq and Syria ("ISIS").  Twitter deeply sympathizes with Plaintiffs for their losses and is committed to combating the spread of terrorist content online.  But Twitter is not liable for these terrorist acts.

Section 230 bars this action in its entirety because Plaintiffs' claims seek to hold Twitter liable for the alleged consequences of third-party content posted on its online platform—as two courts have recently concluded in dismissing analogous claims against Twitter and Facebook. *See Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016) ("*Fields I*"); 217 F. Supp. 3d 1116 (N.D. Cal. 2016) ("*Fields II*"); *Cohen v. Facebook, Inc.*, 2017 WL 2192621 (E.D.N.Y. May 18, 2017).  The Ninth Circuit has repeatedly held that § 230 immunizes online service providers from liability for performing "traditional editorial functions" relating to third-party content, such as disseminating or failing to remove objectionable content created by their users.

*E.g.*, *Fair Hous. Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1184 (9th Cir. 2008) (en banc).  Plaintiffs' claims seek to do precisely that—impose liability on Twitter for publishing other people's content—and so must be dismissed.

Dismissal is independently required because the FAC fails to allege facts necessary for essential elements of Plaintiffs' claims.  Plaintiffs' secondary liability claims fail because the FAC does not allege Twitter knowingly provided substantial assistance to or conspired with the "person[s] who committed" the terrorist acts that injured the Plaintiffs, as § 2333(d) of the ATA requires.  Plaintiffs' direct liability claims under the ATA must be dismissed because the FAC does not allege Twitter committed "violent" or "dangerous" acts that "appear[ed] to be intended" to achieve any statutorily-specified terrorist purpose.  18 U.S.C. § 2331(1)(A)-(B).  The FAC thus fails to demonstrate that Twitter *itself* committed an "act of international terrorism."  And the direct liability claims under both the ATA and state law must also be dismissed because the FAC does not plausibly plead that Twitter proximately caused Plaintiffs' injuries.

Dismissal should be with prejudice, as no further amendment could cure these defects.

## STATEMENT OF FACTS

Plaintiffs are family members of Nohemi Gonzalez and Alexander Pinczowski.  FAC ¶¶ 39-43.  The FAC alleges that terrorists affiliated with ISIS killed Ms. Gonzalez in an attack in Paris in November 2015, *id.* ¶¶ 1, 19, 301, 433, 510-512, and killed Mr. Pinczowski in an attack in Brussels in March 2016, *id.* ¶¶ 1, 19, 302, 471, 528.  The United States has designated ISIS as a Foreign Terrorist Organization under § 219 of the Immigration and Nationality Act.  *Id.* ¶ 9.

Defendant Twitter operates a global Internet platform for public self-expression and conversation that is available free-of-charge to virtually anyone throughout the world.  *See* FAC ¶¶ 143-144, 151.  Each day, Twitter's hundreds of millions of users send and receive hundreds of millions of Tweets touching on every conceivable topic.  *Id.* ¶ 548.

The FAC exhaustively describes the origins and growth of ISIS and its many atrocities.  FAC ¶¶ 74-137.  The FAC then alleges how individuals affiliated with ISIS carried out the Paris and Brussels attacks, naming 15 individuals who "directly" committed the attacks and 5 others "involved in planning and directing" the attacks.  *Id.* ¶¶ 412-472.  The sixty-one-paragraph, step-

by-step account of the attacks never references Twitter in any way.  *Id.* ¶¶ 412-472.

Instead, the FAC alleges that two of the men who "directly" committed one or both attacks, Abdelhamid Abaaoud and Najim Laachraoui, were among the hundreds of millions who have a Twitter account.  FAC ¶¶ 359, 373, 412.  The FAC does not allege either man used his account in connection with the attacks.  Nor does it allege that Twitter knew they had Twitter accounts or knew that the users of those accounts were affiliated with ISIS or intended to commit terrorist acts.  Although it conclusorily alleges that "ISIS used Twitter's services to facilitate and accomplish" the two attacks (*id.* ¶¶ 20, 34, 307), the FAC does not substantiate that allegation with specifics about any such use.  It instead alleges only that ISIS members or sympathizers sent messages via Twitter's platform praising or claiming responsibility for the attacks, none of which are alleged to have played any role in causing the attacks.  FAC ¶¶ 473-506.

The FAC also recounts in extensive detail other instances, unrelated to the Paris or Brussels attacks, in which ISIS members or sympathizers allegedly posted content intended to spread propaganda (*id.* ¶¶ 11-13, 22, 25-26, 121-123, 132, 134-135, 153, 172-173, 275-279, 292), to intimidate and spread fear (*id.* ¶¶ 15-18, 23-24, 176-186, 287-295), to recruit terrorists (*id.* ¶¶ 14, 226-244, 283), and to raise funds (*id.* ¶¶ 245-254).  The FAC devotes *over 100* paragraphs to describing this content.[1]  According to the FAC, ISIS's use of Twitter "to disseminate its materials and messages … has been essential to … the success of ISIS."  *Id.* ¶ 172.  While the FAC also alleges that ISIS used Twitter services to "plan," "carry out," and "giv[e] instructions" for other unspecified terror attacks (*id.* ¶¶ 13-14, 34, 283), none of the Tweets it purports to describe contains any such content.

As Plaintiffs acknowledge, all the alleged terrorist content posted on Twitter's platform was created entirely by, and posted solely at the direction of, third parties—alleged terrorists or their supporters—and not by Twitter.  FAC ¶¶ 35, 37, 172-300.  Plaintiffs nonetheless seek to hold Twitter liable for the claimed consequences of publishing this content on the theory that by

---

[1]  *See* FAC ¶¶ 11-18, 22, 25-26, 121-123, 132, 134-135, 153, 172-173, 176-186, 189-195, 197-244, 248-255, 257-262, 265-271, 273-279, 283-284, 292-293, 317, 328-329, 359, 362, 376, 382-391, 397-404, 473-506, 549, 554, 556, 562-563, 570-575, 599.

failing to affirmatively prevent ISIS members and sympathizers from posting content, Twitter "knowingly provided material support and resources to ISIS in the form of Twitter's online social network platform and communications services." *Id.* ¶ 33.

Plaintiffs acknowledge that Twitter has rules prohibiting certain types of content on its platform. FAC ¶¶ 551-552. These rules unequivocally ban content that encourages violence, including terrorism.[2] The FAC recognizes that Twitter enforces these rules by reviewing and removing content and blocking or suspending accounts when notified of a violation. FAC ¶¶ 552, 557. And the FAC refers to Twitter's announcement of its own affirmative steps to "identify and suspend ISIS Twitter accounts"—including suspending 125,000 such accounts between the middle of 2015 (months before the two attacks) and February 5, 2016.[3] But Plaintiffs allege these efforts were insufficient, and that Twitter should have more "proactively monitor[ed]" and "remov[ed] … content," "filter[ed] out … tweets before they appear," and "suspend[ed]" and "block[ed]" ISIS-affiliated accounts. *Id.* ¶¶ 552, 545-547, 549, 557-559.

Rather than suing any perpetrators of the Paris and Brussels attacks, the FAC instead names Twitter as the sole Defendant. Plaintiffs seek damages under the ATA and state tort law for injuries allegedly sustained by their decedents and themselves. Counts I and II seek to hold Twitter secondarily liable under § 2333(d) on the theory that it knowingly provided substantial assistance to, and conspired with, ISIS. Count III seeks to hold Twitter directly liable under § 2333(a) on the theory that it provided "material support" to ISIS in violation of 18 U.S.C. § 2339A, and that, "but for" that support, the attacks "would have been substantially more difficult to implement." *Id.* ¶¶ 642-647. Count IV also asserts direct liability under § 2333(a) on

---

[2] Specifically, the rules have always banned "threats" and use of the platform "for any unlawful purposes or in furtherance of illegal activities" and, for the sake of clarity, have since April 2015 made the ban on terrorist content more explicit by expressly prohibiting "threats of violence … including threatening or promoting terrorism." The Twitter Rules, https://support.twitter.com/ articles/18311 (last visited June 9, 2017). The Twitter Rules and Twitter's February 2016 blog post are incorporated by reference into the FAC because it "necessarily relies upon" them (*e.g.*, FAC ¶¶ 551-552, 580), there is no basis to question their authenticity, and they are relevant. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

[3] *See* FAC ¶ 580 (referring to *Combatting Violent Extremism*, https://blog.twitter.com/official/ en_us/a/2016/combating-violent-extremism.html (last visited June 9, 2017)).

1    a material support theory, relying on 18 U.S.C. § 2339B.  Finally, Plaintiffs assert two state law

2    claims, for wrongful death (Count V) and negligent infliction of emotional distress (Count VI).

**LEGAL STANDARDS ON A MOTION TO DISMISS**

4    Rule 12(b)(6) requires dismissal where a complaint fails to "contain sufficient factual

5    matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*,

6    556 U.S. 662, 678 (2009) (internal quotation marks omitted).  The court need not "accept as true

7    allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

8    inferences."  *In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1055 (9th Cir. 2008).

9    Section 230 requires dismissal where its applicability "is evident from the face of the

10   complaint."  *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *see also Kimzey v.*

11   *Yelp!*, 836 F.3d 1263 (9th Cir. 2016).  Because § 230 protects online service providers not only

12   from "ultimate liability," but also from "having to fight costly and protracted legal battles,"

13   *Roommates*, 521 F.3d at 1175, the immunity must resolved "at the earliest possible stage of the

14   case," *Nemet Chevrolet v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

**ARGUMENT**

16   **I.    Section 230 Requires Dismissal Of All Of Plaintiffs' Claims**

17   **A.    Section 230 Immunizes Twitter From Liability For Third-Party Content**

18   The broad scope of § 230 is apparent on its face: "No provider or user of an interactive

19   computer service shall be treated as the publisher or speaker of any information provided by

20   another information content provider."  47 U.S.C. § 230.  This provision "immunizes providers

21   of interactive computer services against liability arising from content created by third parties."

22   *Roommates*, 521 F.3d at 1162.  Immunity extends to any lawsuit that "treat[s]" a provider as the

23   "publisher" of third-party content by seeking to impose liability for performing or failing to

24   perform a "'traditional editorial function'" such as "reviewing, editing, and deciding whether to

25   publish or to withdraw from publication" any content created by users of its services.  *Barnes v.*

26   *Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009); *see also Airbnb, Inc. v. City & Cty. of San*

27   *Francisco*, 2016 WL 6599821, at *4 (N.D. Cal. Nov. 8, 2016) (§ 230 bars liability premised on

28   an "obligation … to monitor, edit, withdraw or block the content supplied by" provider's users).

Courts across the country "have treated § 230(c) immunity as quite robust." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).  Section 230 has been applied in cases involving a broad range of allegedly odious and harmful content, including a false and defamatory hoax that led to death threats, *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997); lawless ads from sex traffickers, *Doe v. Backpage.com*, 817 F.3d 12, 21 (1st Cir. 2016); child pornography, *Doe v. Bates*, 2006 WL3813758 (E.D. Tex. Dec. 27, 2006); terrorists' incitements to violence, *Klayman*, 753 F.3d at 1356-1357; and inflictions of emotional distress, *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016).

The courts in *Fields* and *Cohen* applied these principles to dismiss claims just like those asserted here.  In *Fields*, the plaintiffs alleged that Twitter had provided "material support" to ISIS by permitting ISIS members and sympathizers to use its services and that that "support" had proximately caused a terrorist attack in which an alleged ISIS operative shot and killed plaintiffs' decedents.  The plaintiffs in *Cohen* asserted similar claims with respect to Facebook and Hamas. Both courts held that § 230 barred these claims because they sought to hold Twitter and Facebook liable for a quintessential publisher function—making third-party content available on their platforms.  *See Fields I*, 200 F. Supp. 3d at 970-974; *Fields II*, 217 F. Supp. 3d at 1123-1127; *Cohen*, 2017 WL 2192621, at *12-13.  The same is true here.

### B.    Plaintiffs' Claims Meet All Elements Of § 230 Immunity

Section 230 mandates dismissal when (1) the defendant is a "provider … of an interactive computer service"; (2) the allegedly harmful content at issue was "provided by another information content provider," and not the defendant; and (3) the claim seeks to hold the defendant liable as a "publisher or speaker" of that content.  47 U.S.C. § 230(c)(1); *see Barnes*, 570 F.3d at 1100-1101.  Each of these elements is met here.

### 1.    Twitter's Platform Is An "Interactive Computer Service"

An "interactive computer service" includes "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2).  It is undisputed that Twitter's online platform satisfies this definition.  FAC ¶ 33; *see also id.* ¶¶ 584-585; *accord Fields I*, 200 F. Supp. 3d at 969.

2.      **Third Parties Provided The Allegedly Harmful Content Underlying Plaintiffs' Claims**

The second element—that "another information content provider" provided the content at issue—also is met here.  An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).  There is no allegation here that Twitter had any hand in the "creation or development" of any of the ISIS-related content on which Plaintiffs' claims are based.  To the contrary, the FAC alleges that all of that content was created and posted by third-party users—persons allegedly associated with or inspired by ISIS.  *See, e.g.*, FAC ¶¶ 183, 197, 204-205, 236, 251-253, 275.  Because "a third party willingly provide[d] the essential published content," Twitter "receives full immunity regardless of the specific editing or selection process."  *Carafano*, 339 F.3d at 1124.

This is true even though Twitter offers its users neutral tools to create, promote, and discover online content such as "applications" and "specialized tools and features."  FAC ¶¶ 144-145.  Plaintiffs allege, for example, that ISIS-affiliated accountholders used hashtags (*e.g. id.* ¶¶ 181-186), a tool for "advanced locating, filtering, and displaying content" (*e.g. id.* ¶ 145), and developed applications using Twitter's open-source design features (*e.g. id.* ¶¶ 146, 187-191) to "amplify[]" (*id.* ¶ 191) ISIS content on Twitter.  The court in *Fields* rejected similar allegations, explaining that § 230 applies to "Twitter's decisions [about how] to structure and operate itself as a 'platform.'"  *Fields I*, 200 F. Supp. 3d at 972.  And it is well established that providing users "*neutral* tools" does not affect Section 230 immunity, even if third parties use them "to carry out what may be unlawful or illicit" activities, "absent substantial affirmative conduct on the part of the website creator *promoting the use of such tools for unlawful purposes*."  *Roommates*, 521 F.3d at 1169, 1174 n.37 (emphasis added); *see also Backpage*, 817 F.3d at 21.  No such conduct by Twitter is alleged.  To the contrary, as the FAC acknowledges, Twitter has rules expressly banning terrorist threats.  *See supra* p. 4 n.2.  Twitter did not become a content provider simply because it provided users "tools of general applicability."  *Roommates*, 521 F.3d at 1169 n.24.

Plaintiffs likewise cannot avoid § 230 on the theory that, by allegedly displaying ads near

alleged ISIS-created content, Twitter created "unique combinations of advertising and user content" as to which Twitter itself was the "content provider." FAC ¶¶ 27, 623-627. The Ninth Circuit has uniformly rejected this gambit, holding that § 230 immunity is not forfeited merely because the third-party content at issue was displayed alongside other third-party content. *E.g.*, *Batzel v. Smith*, 333 F.3d 1018, 1021-1022 (9th Cir. 2003) (website displaying "amalgamation of material" immune under § 230). A provider does not "develop" content under § 230 by "augmenting the content generally," but only where it "contributes materially to the *alleged illegality* of the content." *Roommates*, 521 F.3d at 1167-1168 (emphasis added). "[M]aterial contribution" means "being responsible for what makes the displayed content allegedly unlawful." *Jones v. Dirty World Entm't Recordings*, 755 F.3d 398, 410 (6th Cir. 2014). Here, Plaintiffs do not allege that by allegedly displaying ads nearby, Twitter "change[d] the meaning and purpose" of any ISIS-related content, *Ascentive v. Opinion Corp.*, 842 F. Supp. 2d 450, 474 (E.D.N.Y. 2011), or otherwise contributed to what made the content unlawful.

Nor does it matter that Twitter allegedly used "algorithms and analyses of particularized data" to determine what combination of "features and characteristics from various sources" would appear on its platform. FAC ¶ 623-624. The use of tools to filter or arrange third-party content does not involve the "creation" or "development" of information under § 230. *See Roommates*, 521 F.3d at 1167-1168; *Carafano*, 339 F.3d at 1124 (categorizing user information); *Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *6-9 (N.D. Cal. Oct. 26, 2011) (aggregating ratings based on user-generated data); *O'Kroley v. Fastcase, Inc.*, 831 F.3d 352, 355 (6th Cir. 2016) (Google's automated algorithmic editing of search result snippets); *Cohen*, 2017 WL 2192621, at *1 (Facebook immune under § 230 notwithstanding its "promoting content, websites, advertisements, users, groups, and events … to a user based on their usage history").

It likewise is irrelevant that Twitter allegedly derived revenue from displaying "targeted" advertisements. FAC ¶¶ 617-621. There is no "for-profit exception to § 230's broad grant of immunity." *M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1050 (E.D. Mo. 2011). It is simply "immaterial" under § 230 whether "a website elicits online content for profit." *Goddard v. Google, Inc.*, 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17,

1    2008); *Roommates*, 521 F.3d at 1161, 1174-1175 (affirming immunity even though website

2    derived "revenue from advertisers and subscribers").

3              **3.        Plaintiffs' Claims Seek To Treat Twitter As A Publisher**

4              Finally, Plaintiffs' claims seek to hold Twitter liable as the "publisher or speaker" of

5    allegedly harmful third-party content within the meaning of § 230.  Plaintiffs seek to hold

6    Twitter liable for their injuries because, they allege, Twitter "knowingly" permitted ISIS to use

7    its platforms to spread propaganda, intimidate, raise funds, and recruit members (*e.g.* FAC ¶¶ 33,

8    170-172, 176-198, 226, 245-254, 275), and failed to take steps to stop this activity by "block[ing]

9    ISIS's use of Twitter" by "proactively monitor[ing]" and "remov[ing] … content," "filter[ing]

10   out … tweets before they appear," or "identify[ing], flag[ging], review[ing]" and "suspend[ing]

11   or block[ing] ISIS-related Twitter accounts" (*id.* ¶¶ 552, 545, 557-559, 596).  Their theory, in

12   other words, is that Twitter allowed third parties to post allegedly harmful content and failed to

13   do enough to block or remove that content and the users who posted it.

14             Those alleged acts and omissions by Twitter are "traditional editorial functions," and so

15   are "precisely the kind of activity for which Congress intended to grant absolution with the

16   passage of section 230." *Roommates*, 521 F.3d at 1171-1172 (provider not liable for "failing to

17   detect and remove" unlawful content); *accord Fields I*, 200 F. Supp. 3d 964 (finding similar

18   ATA claims to be "at their core" about disseminating third-party content); *Fields II*, 217 F. Supp.

19   3d 1116 (same); *Cohen*, 2017 WL 2192621, at *11-12 (same). "[R]emoving content is something

20   publishers do, and to impose liability on the basis of such conduct necessarily involves treating

21   the liable party as a publisher of the content it failed to remove." *Barnes*, 570 F.3d at 1103.  As

22   the Ninth Circuit has reiterated, § 230 was specifically "enacted to protect websites against the

23   evil of liability for failure to remove offensive content." *Roommates*, 521 F.3d at 1174.   And

24   because the same content-removal theory underlies all of Plaintiffs' claims, § 230 mandates

25   dismissal of the entire FAC.  A plaintiff cannot avoid § 230 by placing a different "labe[l]" on

26   "an action that is quintessentially that of a publisher." *Barnes*, 570 F.3d at 1103.

27             Plaintiffs cannot avoid this conclusion by asserting that their claims arise not from

28   specific content posted by third-party users, but instead from Twitter's alleged provision of "its

platform and services" to ISIS and its supporters.  FAC ¶¶ 35, 298, 622.  The courts in *Fields* and *Cohen* rejected a nearly identical argument—that plaintiffs' claims turned on only the "provision of accounts" and not on the provider having published ISIS- or Hamas-related content.  *Fields I*, 200 F. Supp. 3d at 970-974; *Fields II*, 217 F. Supp. 3d at 1123-1127; *Cohen*, 2017 WL 2192621, at *12-13.  Federal appellate courts have similarly rebuffed attempts outside the context of terrorism to evade § 230 by casting claims as concerning only the provision of accounts.  *See Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420 (1st Cir. 2007) (§ 230 barred claims allegedly based on Lycos's decision "not [to] prevent a single individual from registering under multiple screen names," which allegedly "ma[de] it possible for individuals to spread misinformation more credibly"); *Doe v. MySpace, Inc.*, 528 F.3d 413, 419-420 (5th Cir. 2008) (allegations premised on failure to screen users when opening an account was "merely another way of claiming that MySpace was liable for publishing [users'] communications").

As in those cases, the first problem with Plaintiffs' platform-provision theory is that "it does not align with the allegations in the [FAC]," which is "riddled with detailed descriptions of ISIS-related messages, images, and videos."  *See Fields I*, 200 F. Supp. 3d at 971; *see also Cohen*, 2017 WL 2192621, at *12.  As noted earlier (at p. 3 & n. 1), the FAC includes more than *100* paragraphs detailing content allegedly posted by ISIS or its supporters and describing that content's alleged role in the "expansion and success of ISIS."  FAC ¶ 11.  It alleges, for example, that ISIS used Twitter's platform to "broadcast images," "launch and propagate a series of short videos," "distribute pamphlets," "call[] for donations," "disseminate its propaganda in print and video," "reach out to many thousands of potential recruits with its messages and videos," and "provid[e] a constant stream of religious teachings, mantras, and images."  *Id.* ¶ 197, 227, 235, 239, 244, 247, 270, 275.  If ISIS members and sympathizers had opened accounts but never used them to recruit followers, raise funds, and spread propaganda, then Plaintiffs could not possibly allege that "Twitter's services have played a uniquely essential role in the development of ISIS's image, its success in recruiting members from around the world, and its ability to carry out attacks," including the attacks that killed Ms. Gonzalez and Mr. Pinczowski.  *Id.* ¶ 14.  Plainly, the "rationale behind" Plaintiffs' claims is that "Twitter should not have provided accounts to

ISIS *because ISIS would and has used those accounts to post objectionable content*." *Fields II*, 217 F. Supp. 3d at 1125.  This is a content-based theory and therefore is plainly barred by § 230.

But even if the FAC could be read to advance a platform-provision theory, § 230 would still bar its claims because that theory would impermissibly penalize a protected publishing decision: "the decision to permit third parties to post content." *Fields I*, 200 F. Supp. 3d at 972.  Any policy that bars specific users "necessarily targets the content, ideas, and affiliations of [those] particular account holders." *Fields II*, 217 F. Supp. 3d at 1123; *cf. Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) (restrictions based on a speaker's identity often are "'simply a means to control content'").  A provider's "choices as to *who* may use its platform," in other words, "are inherently bound up in its decisions as to *what* may be said on its platform." *Cohen*, 2017 WL 2192621, at *12 (emphasis added).  Any "attempt to draw a narrow distinction between policing accounts and policing content must ultimately be rejected." *Id.* at *12.

Indeed, the only differences between imposing liability on Twitter for not removing particular Tweets and imposing liability for not denying a user access to its platform are the scope and timing of the decisions at issue.  Under both theories, "the alleged wrongdoing is the decision to permit third parties to post content—it is just that under [a] provision of accounts theory, Twitter would be liable for granting permission to post … instead of for allowing postings that have already occurred." *Fields I*, 200 F. Supp. 3d at 972.  Because "[a] distinction between removing an item once it has appeared on the Internet and screening before publication cannot fly," *Batzel*, 333 F.3d at 1032, any platform-provision theory is "just as barred by section 230(c)(1)" as a theory directly challenging Twitter's decisions about "what [particular] third-party content may be posted." *Fields I*, 200 F. Supp. 3d at 972.

## II.    All Of Plaintiffs' Claims Also Independently Fail On Their Own Terms

### A.    Plaintiffs' Secondary Liability Claims Fail (Counts I-II)

Counts I and II assert claims for secondary liability under § 2333(d), a provision recently added to the ATA by JASTA, Pub. L. No. 114-222.  That provision limits liability to a defendant that aided or conspired with a specific person—"the person who committed" the attack.  18 U.S.C. § 2333(d).  Aid to a terrorist organization—rather than to the actual persons who

perpetrated the attack—is not enough to trigger liability.  Here, the only terrorist acts alleged are the Paris and Brussels attacks (FAC ¶¶ 1, 630-633, 641), and the persons whom the FAC identifies as having "directly" committed those attacks are Abaaoud, Laachraoui, and 13 other individuals (*id.* ¶¶ 412, 463-464, 469).  Because the FAC does not allege that Twitter knowingly and substantially assisted or conspired with those individuals, Counts I and II fail.

**1.**  Aiding and abetting requires, at least, that (a) the defendant provided assistance "knowingly"; and (b) the assistance provided was "substantial." 18 U.S.C. § 2333(d).  Plaintiffs do not come close to satisfying the first requirement.  They do not allege—conclusorily or otherwise—that Twitter *knew* Abaaoud, Laachraoui, or any of the other attackers even existed, let alone that any of them wanted to carry out these attacks.  And the FAC's only references to Twitter allegedly having had any advance knowledge of the attacks (FAC ¶¶ 638, 645) are threadbare recitals that are not entitled to a presumption of truth.  *See Iqbal*, 556 U.S. at 678.

Nor does the FAC allege "substantial" assistance.  In adding § 2333(d), JASTA invoked *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).  *See* JASTA § 2(a)(5), Pub. L. No. 114-222.  The *Halberstam* court used six factors to assess whether aid to another's unlawful act was "substantial": "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other [tortfeasor,] … his state of mind," 705 F.2d at 478, and the "duration of the assistance provided," *id.* at 484.  All these factors cut against liability.  The FAC asserts only that Twitter made its social media platform broadly available and a few people linked to ISIS were among the many who used it.  No allegation suggests Twitter encouraged any attacker, was essential to either attack or present during the attacks, had any relationship with any attacker, or had any intention to assist, or in fact did assist, them in carrying out the attacks, much less for a meaningful duration.  Indeed, the FAC acknowledges acts that were the opposite of assistance, such as removing ISIS content and accounts (¶¶ 558-559, 581) and maintaining rules that ban terrorist-threats.  *See supra* p. 4.

**2.**  The FAC similarly fails to allege Twitter conspired with any attacker (or anyone else) to commit the attacks.  Agreement to violate the law is the essence of conspiracy; without an actual and culpable meeting of the minds between alleged conspirators, there is no liability.

*Halberstam*, 705 F.2d at 487; *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999).

Beyond another threadbare recital (FAC ¶ 638), Plaintiffs offer no factual allegations suggesting

Twitter had any agreement with *anyone* regarding the attacks.  They allege, at most, that Twitter

had a general agreement with each of its many millions of users to provide online services, and

that some tiny fraction of those users were affiliated with ISIS.  That is far from enough.

### B.      Plaintiffs' Direct Liability Claims Fail (Counts III-VI)

1.      <u>Twitter Committed No "Act Of International Terrorism" (Counts III-IV)</u>

Section 2333(a) permits a U.S. national "injured … by reason of an act of international

terrorism" to "sue therefor."  18 U.S.C. § 2333(a).  Direct liability under this provision requires

that the defendant *itself* committed "an act of international terrorism" that caused plaintiff's

injury.  *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013); *Brill v. Chevron Corp.*, 2017 WL

76894, *3 (N.D. Cal. Jan. 9, 2017).

The only terrorist acts alleged to have caused the deaths of Ms. Gonzalez and Mr.

Pinczowski were the Paris and Brussels attacks "directly" committed by 15 men, FAC ¶¶ 412,

464, 469, and not by Twitter.  Plaintiffs try to overcome that obstacle by claiming that by

providing online services to individuals linked to ISIS, along with hundreds of millions of others,

Twitter violated two criminal "material support" statutes, 18 U.S.C. §§ 2339A, 2339B, and

thereby triggered direct liability under the ATA.  FAC ¶ 647, 652. "International terrorism,"

however, is a defined term "consist[ing] of three elements," *Brill*, 2017 WL 76894 at *4—only

one of which is violation of a criminal law, *see* 18 U.S.C. § 2331(1).  And the FAC neither

attempts to satisfy two of those elements, *see* FAC ¶¶ 630-633 (reciting elements for the two

attacks, but not for any act of Twitter), nor pleads facts that could satisfy them.

In particular, the FAC does not allege (a) "violent" or "dangerous" conduct by Twitter

that (b) "appear[s] to [have] be[en] intended" to achieve a specified terrorist purposes.  18 U.S.C.

§ 2331(1)(A), (B).  As to the qualitative element, Twitter's services are not violent or dangerous

and do not become so simply because a terrorist (or anyone else among its millions of users)

might use them improperly.  And as for the appearance element, no "objective observer [would]

conclude" that Twitter sought a specified terrorist end.  *See Stansell v. BGP, Inc.*, 2011 WL

1   1296881, at *9 (M.D. Fla. Mar. 31, 2011).  Offering general services to the public at large does

2   not satisfy this requirement.  The *Boim* court, for example, noted that the Red Cross "provide[s]

3   [medical] assistance without regard to the circumstances giving rise to the need for it."  *Boim v.*

4   *Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 699 (7th Cir. 2008).  Although it "might

5   know in advance" that it will "provid[e] … assistance to [individual] terrorists," an objective

6   observer would conclude that providing such aid was intended to achieve a humanitarian, not a

7   terrorist purpose.  *Id.*  Likewise, in *In re Terrorist Attacks on Sept. 11, 2001*, the court dismissed

8   a complaint that relied on the mistaken proposition "'that a bank is liable for injuries done with

9   money that passes through its hands in the form of deposits, withdrawals, check clearing

10  services, or any other routine banking service.'"  349 F. Supp. 2d 765, 832-833 (S.D.N.Y. 2005).

11  Here, too, an objective observer would conclude Twitter intended only to make its services

12  widely available, enabling millions to exchange information, express themselves, and

13  communicate about issues great and small.  *E.g.*, FAC ¶¶ 13, 548-549.  No reasonable observer

14  could conclude Twitter intended to "intimidate or coerce a civilian population," "influence the

15  policy of a government by intimidation or coercion," or "affect the conduct of a government by

16  mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1)(B).

17  2.    <u>Twitter Did Not Proximately Cause The Attacks (Count III-VI)</u>

18         Finally, Plaintiffs' claims for direct liability under the ATA and under state tort law fail

19  because the FAC does not establish that Twitter proximately caused Plaintiffs' injuries, as both

20  the ATA and state law require.  *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123-

21  125 (2d Cir. 2013) ("*Al Rajhi*") (ATA); *Rothstein*, 708 F.3d at 95 (ATA); *Haft v. Lone Palm*

22  *Hotel*, 478 P.2d 465, 469-470 (Cal. 1970) (wrongful death); *Dillon v. Legg*, 441 P.2d 912, 924

23  (Cal. 1968) (negligent infliction of emotional distress).  Like other statutes that contain the same

24  "by reason of" language as the ATA, the ATA requires "some *direct relation* between the injury

25  asserted and the injurious conduct alleged."  *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268

26  (1992) (emphasis added); *see also id.* ("the same words" ordinarily "have the same meaning").

27         Plaintiffs do not clearly identify what they suppose is the first link in the alleged chain of

28  causation—*i.e.*, particular conduct by Twitter amounting to an "act of international terrorism."

*See* FAC ¶ 646 (vaguely referring only to "material support and resources provided by Twitter"). It cannot be the allegation that Abaaoud and Laachraoui had Twitter accounts (*id.* ¶¶ 20-21, 359, 364, 373, 375, 378), because the FAC nowhere alleges that Twitter *knew* about Abaaoud or Laachraoui, much less their terrorist aims or affiliations. *See supra* p. 12.  Twitter's alleged failure to block their accounts thus could not violate either criminal material support statutes on which Plaintiffs rely, both of which require knowledge. *See* 18 U.S.C. §§ 2339A, 2339B.

Instead, Plaintiffs seem to suggest that Twitter's alleged failure to prevent ISIS *in general* from using its platform is an "act of international terrorism" that caused their decedents' deaths. *E.g.,* FAC ¶¶ 12-18, 152-300.  This theory fails for a different reason:  far too many intervening actors and events separate those tragic deaths from ISIS's alleged general use of Twitter services. *See Hemi Grp. v. City of New York*, 559 U.S. 1, 10–11 (2010) (a theory that "stretche[s] the causal chain … well beyond the first step" fails the "direct relationship" test).  Courts repeatedly have rejected similarly attenuated theories.  The Second Circuit rejected allegations that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda … proximately caused the September 11, 2001 attacks." *Al Rajhi*, 714 F.3d at 124.  That court likewise rejected allegations that UBS provided a state sponsor of terrorism with cash that would be used to cause and facilitate terrorist acts, *Rothstein*, 708 F.3d at 97, and allegations that defendants "provided funding to purported charity organizations known to support terrorism that, in turn, provided funding to al Qaeda and other terrorist organizations," *Al Rajhi*, 714 F.3d at 124.  And in *Fields*, Judge Orrick rejected as too "expansive" the theory that Twitter's alleged "provision of accounts to ISIS" rendered Twitter responsible for a terrorist attack allegedly carried out by an ISIS member. *Fields II*, 217 F. Supp. 3d at 1127.

Accepting Plaintiffs' causation theory would have staggering consequences, exposing online providers to possible liability for "any ISIS-related injury without alleging any connection between a particular terrorist act and [its services]." *See Fields II*, 217 F. Supp. 3d at 1127.  The doctrine of proximate cause does not stretch that far.

## CONCLUSION

For all the above reasons, the FAC must be dismissed without leave to amend.

1

2

3  Dated: June 9, 2017                        Respectfully submitted,

4                                             /s/ Patrick J. Carome
                                             SETH P. WAXMAN (*pro hac vice*)
5                                             seth.waxman@wilmerhale.com
                                             PATRICK J. CAROME (*pro hac vice*)
6                                             patrick.carome@wilmerhale.com
                                             ARI HOLTZBLATT (*pro hac vice*)
7                                             ari.holtzblatt@wilmerhale.com
                                             WILMER CUTLER PICKERING
8                                               HALE AND DORR LLP
9                                             1875 Pennsylvania Avenue, NW
                                             Washington, D.C. 20006
10                                            Telephone:  (202) 663-6800
                                             Facsimile:  (202) 663-6363
11

12                                            MARK D. FLANAGAN (CA SBN 130303)
                                             mark.flanagan@wilmerhale.com
13                                            WILMER CUTLER PICKERING
                                               HALE AND DORR LLP
14                                            950 Page Mill Road
                                             Palo Alto, California 94304
15                                            Telephone:  (650) 858-6000
                                             Facsimile:  (650) 858-6100
16

17                                            *Counsel for Defendant Twitter, Inc.*

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 9, 2017, I electronically filed the above document with the clerk of the court using CM/ECF, which will send electronic notification of such filing to all registered counsel.

By: <u>/s/ Patrick J. Carome</u>
Patrick J. Carome