ROBERT L. TOLCHIN
*Pro Hac Vice petition pending*
THE BERKMAN LAW OFFICE, LLC
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
Email: rtolchin@berkmanlaw.com

*Attorney for Plaintiffs Anne Cameron Cain
(Individually and as Representative of the
Estate of Alexander Pinczowski), Beatriz
Gonzalez (Individually and as Representative
of the Estate of Nohemi Gonzalez), Jose
Gonzalez, Jose Hernandez, Rey Gonzalez,
and Paul Gonzalez*

KEITH L. ALTMAN
Excolo Law, PLLC
26700 Lahser Road, Suite 401
Southfield, MI 48033
(516) 456-5885
Email: kaltman@lawampmmt.com

*Attorney for Reynaldo Gonzalez*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

------------------------------------------------------------- X

ANNE CAMERON CAIN, individually and as
representative on behalf of the Estate of
ALEXANDER PINCZOWSKI;

BEATRIZ GONZALEZ, individually and as
representative on behalf of the Estate of NOHEMI
GONZALEZ; JOSE HERNANDEZ; REY
GONZALEZ; PAUL GONZALEZ; and
REYNALDO GONZALEZ,

                     Plaintiffs,

             -against-

TWITTER, INC.,

                   Defendant.

------------------------------------------------------------- X

Case No:
3:17-CV-02506(JD)

**PLAINTIFFS' BRIEF IN
OPPOSITION TO
TWITTER'S MOTION TO
DISMISS**

Hon. James Donato

Hearing Date: Sept. 14, 2017
Time: 10:00 a.m.
Courtroom: 11, 19th floor

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

INTRODUCTION AND BACKGROUND ........................................................................1

STATEMENT OF ISSUES TO BE DECIDED................................................................2

LEGAL STANDARD ........................................................................................................2

ARGUMENT

I.      TWITTER DOES NOT CONTEST ITS VIOLATIONS OF 18 U.S.C. §§ 2339A-B ......2

II.     JASTA STRENGTHENED THE ATA, AND DISPOSES OF TWITTER'S
        DEFENSES...........................................................................................................3

III.    PLAINTIFFS' ALLEGATIONS STATE ATA CLAIMS AGAINST TWITTER ............4

        A.      Twitter Misstates the Requirements for Secondary Liability Under § 2333(d) ........4

                1.      Twitter Aided and Abetted ISIS's Acts of International Terrorism ............5

                2.      Twitter Conspired with ISIS ......................................................................7

        B.      Twitter is Directly Liable to Plaintiffs Pursuant to 18 U.S.C. § 2333(a).................7

                1.      Twitter's Unlawful Acts Meet the Definition of International Terrorism ....7

                2.      Plaintiffs Were Injured "By Reason of" an Act of International Terrorism.9

IV.     THE CDA DOES NOT AFFORD IMMUNITY TO TWITTER IN THIS CASE .......11

        A.      The CDA Does Not Bar the ATA Claims ...........................................................11

        B.      The CDA Does Not Have Extraterritorial Application .......................................13

        C.      Twitter Functionality Assists ISIS in Conducting Terrorist Operations ................14

        D.      Twitter is an Information Content Provider .........................................................14

CONCLUSION ................................................................................................................15

# **TABLE OF AUTHORITIES**

<u>Cases</u>

*Airbnb, Inc. v. City & Cty of San Francisco*, 2016 WL 6599821 (N.D. Cal. Nov. 8, 2016) ................12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................2

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ........................................................11

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998) ....................................................15

*Boim v. Holy Land Found. For Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008)....................8

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000 (7th Cir. 2002) ....8

*Brill v. Chevron Corp.*, 2017 WL 76894 (N.D. Cal. Jan 9, 2017) ........................................9

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ....................................14

*E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991) ....................................................13

*Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) ....................15

*Foley Bros., Inc. v. Filardo*, 336 U.S. 281 (1949) ............................................................13

*Foman v. Davis*, 371 U.S. 178 (1962) ............................................................................15

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ....................................................5, 6

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................8, 12

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) ....................14

*Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013) ........................................13

*Linde v. Arab Bank*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015) ..........................................8, 10

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) ....................................5

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F. 3d 1025 (9th Cir. 2008) ....................2

*U.S. v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ....................................................................12

<u>Statutes</u>

140(d)(2) of the Foreign Relations Authorization Act ........................................................10

18 U.S.C. § 2333 ........................................................................................................ passim

18 U.S.C. § 2339A ...................................................................................................... passim

18 U.S.C. § 2339B ...................................................................................................... passim

18 U.S.C. § 2339C ............................................................................................................ 12

47 U.S.C. § 230 ......................................................................................................... passim

50 U.S.C. § 1705 ............................................................................................................... 1

8 U.S.C. § 1182(a)(3)(B) ................................................................................................ 10

Foreign Sovereign Immunities Act ............................................................................... 2, 3

Justice against Sponsors of Terrorism Act" ("JASTA"), Pub. L. No. 114-222 (2016) .................... passim

Other Authorities

Executive Order No. 13224 ............................................................................................... 1

Rules

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 3, 15

Fed. R. Civ. P. 15(a)(2) .................................................................................................... 15

Regulations

31 C.F.R. § 594.204 ........................................................................................................... 1

## **INTRODUCTION AND BACKGROUND**

This case is about the right of terror victims' families to seek relief against Twitter, a company that has for years knowingly aided, abetted, conspired, and provided material support and resources to the notorious terrorist organization ISIS in defiance of federal criminal law and without regard to human life.

The brazenness with which Twitter has spurned criticism of its provision of material support and resources to ISIS, and the unprecedented role that Twitter has played in the effectiveness and growth of ISIS to become the dominant terrorist organization in the world, are well documented. The facts—recorded in Congressional testimony, legislative inquiries, criminal proceedings, military and intelligence reports, professional and educational studies, journalists' investigations and articles, and Twitter's own platform, computer servers and archives—are voluminous. Plaintiffs' lengthy and detailed complaint ("FAC") could only contain an overview and sampling of relevant examples, including evidence of how ISIS used Twitter specifically in relation to the Paris and Brussels terror attacks in which Nohemi Gonzalez and Alexander Pinczowski were murdered. Thus, the issues before the Court in deciding Twitter's motion to dismiss are less about the sufficiency of the facts, and more about the consequences and the law.

First, the FAC alleges that Twitter violated two federal criminal statutes (18 U.S.C. §§ 2339A-B) by knowingly providing material support or resources to ISIS, a designated foreign terrorist organization ("FTO"). Twitter <u>does not contest</u> adequacy of the allegations of these violations in its motion to dismiss.

Second, the FAC asserts civil ATA claims against Twitter for aiding and abetting and conspiracy liability (Counts I-II) pursuant to 18 U.S.C. § 2333(d) (newly added by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (2016)), for ISIS's acts of international terrorism that resulted in the victims' deaths. Again, Twitter <u>does not contest</u> the sufficiency of allegations that Twitter knowingly provided substantial assistance <u>to ISIS</u>, or even that Twitter agreed to provide its platform and services <u>to ISIS</u> in violation of the law. Rather, Twitter erroneously asserts that § 2333(d) requires proof that Twitter's aid and agreement must specifically have been to and with the individual ISIS attackers, and directed specifically for the purpose of carrying out the Paris and Brussels attacks. Twitter's arguments contradict the language of the statute, and thus fail.

Third, the FAC asserts "direct" civil ATA claims against Twitter under 18 U.S.C. § 2333(a) (Counts III-IV), for providing material support or resources to ISIS in violation §§ 2339A-B. Twitter argues that its

1

1  actions do not meet the definition of "international terrorism" in § 2333(1), or satisfy the ATA standard of

2  proximate cause for "direct" claims. However, the consensus among courts is that violations of §§ 2339A-B

3  constitute "international terrorism" under § 2333(1), and proximate cause is adequately pled.

4        Finally, Twitter claims it is entitled to immunity from suit under that portion of the Communications

5  Decency Act ("CDA") that states that a provider of an "interactive computer service" cannot be "treated as

6  the publisher or speaker of" a third party's content. *See* 47 U.S.C. § 230(c)(1). Twitter's reliance on the CDA

7  is misplaced for a number of reasons discussed below, including, *inter alia*: JASTA expressed Congress'

8  intent that civil ATA claims should prevail over laws inconsistent with the ATA's purpose; the ATA claims

9  do not treat Twitter as the publisher or speaker of ISIS's content; and the CDA does not apply

10  extraterritorially to ATA claims that arose abroad.

11                    **STATEMENT OF ISSUES TO BE DECIDED**

12  1.    Whether the FAC adequately alleges that: (a) Twitter knowingly aided or conspired with ISIS (Counts

13  I-II); (b) Twitter's provision of material support or resources to ISIS constituted "international terrorism"

14  (Counts III-IV); and (c) Twitter's actions were a "proximate cause" of Plaintiffs' injuries (Counts III-VI).

15  2.    Whether 47 U.S.C. § 230(c)(1) applies to Plaintiffs' ATA claims against Twitter for aiding, abetting,

16  conspiring, and providing material support or resources to ISIS in violation of federal criminal law.

17                              **LEGAL STANDARD**

18        On a Rule 12(b)(6) motion to dismiss, a court must accept all allegations of fact in the complaint as

19  true, and draw all reasonable inferences from the allegations in favor of the plaintiff. *Manzarek v. St. Paul Fire*

20  *& Marine Ins. Co.*, 519 F. 3d 1025, 1031 (9th Cir. 2008). The motion must be denied if Plaintiffs allege

21  "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

22  *Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). "Facial plausibility" is not a "probability

23  requirement" but implies "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

24                                 **ARGUMENT**

25  **I.    TWITTER DOES NOT CONTEST ITS VIOLATIONS OF 18 U.S.C. §§ 2339A-B**

26        As a core component of Plaintiffs' claims, the FAC alleges that Twitter knowingly provided material

27  support or resources to ISIS in violation of federal criminal law. Specifically, the FAC contains numerous

28  detailed factual allegations to show that Twitter violated 18 U.S.C. § 2339A, by providing material support

                                       2

or resources to ISIS, knowing that they were to be used in preparation for, or in carrying out, a violation of federal terrorism crimes; and that Twitter violated 18 U.S.C. § 2339B, by providing material support or resources to ISIS, a designated FTO, with knowledge that ISIS: 1) is a designated FTO, 2) has engaged or engages in terrorist activity, or 3) had engaged or engages in terrorism. Crucially, in its motion to dismiss, Twitter <u>does not challenge</u> the sufficiency of the FAC's allegations with regard to Twitter's violations of 18 U.S.C. §§ 2339A-B, or any of the elements of these criminal violations.

## II.    JASTA STRENGTHENED THE ATA, AND DISPOSES OF TWITTER'S DEFENSES

The enactment of JASTA is a "game-changer" that effectively shatters Twitter's motion to dismiss. JASTA greatly expanded and strengthened the ATA as a means of pursuing <u>enablers</u> of terrorism. In addition to amending 18 U.S.C. § 2333 to authorize civil ATA claims for aiding and abetting and conspiracy liability, Congress also enacted specific findings and directives as part of JASTA (appended in the notes to § 2333) expressly extending the reach of the civil ATA to its <u>constitutional limits</u>, and ratifying particular standards to be applied in ATA cases.[1] For example, JASTA included the following provisions:

> (a) … (6) Persons, entities, or countries that <u>knowingly or recklessly</u> contribute material support or resources, <u>directly or indirectly</u>, to persons or organizations that <u>pose a significant risk</u> of committing acts of terrorism that threaten the security of nationals of the United States…necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.
> …
> (b) Purpose.—The purpose of this Act is to provide civil litigants with the <u>broadest possible basis, consistent with the Constitution of the United States</u>, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, <u>directly or indirectly</u>, to foreign organizations or persons that engage in terrorist activities against the United States.

JASTA § 2(a)(6) and (b) (emphasis added). Congress' expression of its intention to provide civil ATA litigants with "the broadest possible basis, consistent with the Constitution of the United States," to pursue

---

[1] *See* Larry M. Eig, "Statutory Interpretation: General Principles and Recent Trends," *Congressional Research Service* (Dec. 19, 2011) ("If the views of a later Congress are expressed in a duly enacted statute, then the views embodied in that statute must be interpreted and applied. Occasionally a later enactment declares congressional intent about interpretation of an earlier enactment rather than directly amending or clarifying the earlier law. Such action can be given prospective effect because, however inartistic, it stands on its own feet as a valid enactment.") (internal quotation omitted).

1  ATA claims is remarkable. The obvious deviation from the standard language of, "consistent with the

2  Constitution <u>and laws</u> of the United States," shows that Congress views ATA claims with supreme

3  importance, and insofar as other statutes or regulations—including the CDA—are inconsistent with the

4  purpose of the ATA, the ATA claims should prevail.

5       Congress' findings and directives enacted as part of JASTA also ratified certain standards to apply in

6  civil ATA actions. For example, Congress ratified a "knowing or reckless" standard for scienter. Instead of

7  requiring proof of specific intent by a provider of material resources, Congress endorsed ATA claims based

8  upon the recipient's likely use ("to persons or organizations that pose a significant risk of committing acts of

9  terrorism," e.g., § 2339A), or the recipient's identity ("to foreign organizations or persons that engage in

10  terrorism," e.g., § 2339B). Finally, Congress ratified a relaxed proximate cause requirement, approving of

11  ATA claims for providing material support to terrorists either "directly or indirectly."

12  **III.   PLAINTIFFS' ALLEGATIONS STATE ATA CLAIMS AGAINST TWITTER**

13       **A.  Twitter Misstates the Requirements for Secondary Liability Under § 2333(d)**

14       Counts I and II of the FAC assert claims against Twitter for aiding and abetting and conspiracy

15  liability pursuant to 18 U.S.C. § 2333(d) for ISIS's acts of international terrorism that resulted in the deaths

16  of Nohemi Gonzalez and Alexander Pinczowski. Twitter's central challenge to these claims is its erroneous

17  argument that § 2333(d) "limits liability to a defendant that aided or conspired with a specific person—'the

18  person who committed' the attack….Aid to a terrorist organization—rather than to the actual persons who

19  perpetrated the attack—is not enough to trigger liability." (MTD at 11-12). Twitter's argument is inherently

20  flawed because it is contrary to the language of the statute. JASTA authorized civil ATA claims for aiding

21  and abetting and conspiracy liability by adding a new subsection (d) to 18 U.S.C § 2333, which provides:

22       (d) Liability.—

23       (1) Definition.—
     In this subsection, the term "person" has the meaning given the term in section 1 of title 1.

24       (2) Liability.—
25       In an action under subsection (a) for an injury arising from an act of international terrorism
     committed, planned, or authorized by an organization that had been designated as a foreign
26       terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C.
     1189), as of the date on which such act of international terrorism was committed, planned,
27       or authorized, liability may be asserted as to any person who aids and abets, by knowingly
     providing substantial assistance, or who conspires with the person who committed such an
28       act of international terrorism.

18 U.S.C. § 2333(d). New § 2333(d)(1), by reference to 1 U.S.C. § 1, defines the term "person" in § 2333(d) to include "associations … as well as individuals." The term "organization" also includes "associations." *See* 8 U.S.C. § 1101(a)(28); 18 U.S.C. § 18. Thus, to limit the meaning of the term "person" in § 2333(d) to individuals—and to exclude a terrorist organization, as Twitter argues—would be to disregard the definition Congress explicitly prescribed for this subsection. Moreover, by its terms, § 2333(d)(2) pertains to "an act of international terrorism <u>committed</u> … by an organization…," so that to exclude an "organization" from the meaning of "the person who <u>committed</u> such an act of international terrorism" would be inherently contradictory. Twitter's argument is thus plainly without merit.

### 1.  Twitter Aided and Abetted ISIS's Acts of International Terrorism

Twitter next extends its flawed reading of § 2333(d), arguing that Count I fails because the FAC does not allege: (a) that Twitter "knowingly" provided assistance to the individual attackers who carried out the Paris and Brussels attacks; or (b) that Twitter's assistance to the individual attackers was "substantial." (MTD at 12). As discussed, Twitter's focus on aiding the individual attackers, rather than aiding ISIS, is misplaced. Twitter's argument about whether Twitter "knowingly" provided "substantial" assistance to these individuals is irrelevant, because the FAC <u>does</u> satisfy these elements with regard to Twitter aiding and abetting ISIS, thus stating a claim under § 2333(d). Tellingly, Twitter <u>does not contest</u> the sufficiency of the FAC's allegations that Twitter "knowingly" provided "substantial" assistance <u>to ISIS</u>.

When Congress codified civil ATA claims for aiding and abetting and conspiracy liability, it directed that the decision in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) "provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code." JASTA § 2(a)(5). An earlier ATA case explained the significance of *Halberstam* as follows:

> In *Halberstam*, the Court … upheld civil aiding and abetting liability, and also civil conspiracy liability, against a woman [Hamilton] who had knowingly and substantially assisted her co-defendant [Welch], a murderer, by performing otherwise legal services, such as acting as banker, bookkeeper and secretary, knowing that these activities assisted his illegal activities, even though she had no specific knowledge of, or intent to commit, the particular illegal activity, *i.e.*, murder, with which she and he were civilly charged. As the court stated, "Although her own acts were neutral standing alone, they must be evaluated in the context of the enterprise they aided, *i.e.*, a five-year-long burglary campaign against private homes."

*Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 583-84 (E.D.N.Y. 2005) (quoting *Halberstam*, 705 F.2d at 488). Indeed, the Court in *Halberstam* stressed that the "principal violation" that Hamilton had assisted was

5

not the murder itself or even the particularly burglary during which the victim was killed; rather it was Welch's ongoing stolen property scheme. In this context, the Court in *Halberstam* explained:

> It was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, it was enough that she knew he was involved in some type of personal property crime at night—whether as a fence, burglar, or armed robber made no difference—because violence and killing is a foreseeable risk in any of these enterprises.

*Halberstam*, 705 F.2d at 488. The Court stated that the extent of liability for aiding and abetting is based upon foreseeability, so that Hamilton was liable for the murder committed by Welch as "a natural and foreseeable consequence of the activity Hamilton helped Welch to undertake." *Id.* at 484, 488.

Applying *Halberstam* and § 2333(d) and to the FAC, Plaintiffs have easily alleged sufficient facts to state a claim against Twitter for aiding and abetting ISIS's acts of international terrorism that resulted in the murder of Nohemi Gonzalez and Alexander Pinczowski. ISIS authorized, planned, and committed the Paris and Brussels attacks that killed the victims, and Twitter does not contest the sufficiency of the allegations to infer that Twitter—at the very least—"had a general awareness of [its] role in [ISIS's] continuing criminal enterprise" of international terrorism. *See Halberstam*, 705 F.2d at 477-78 (discussing first two elements of aiding and abetting). Indeed, Twitter knew it was the sole provider of its Services to ISIS, that it was illegal to provide services to ISIS, and that ISIS openly and actively used Twitter to promote and expand its ongoing terrorist activities. In addition, Twitter certainly knew that ISIS was engaging in illegal and murderous terrorist activity. *See id.* at 488 (it was enough that Hamilton knew that Welch was involved in some type of crime for which violence and killing is a foreseeable risk).

Finally, Twitter's assistance to ISIS was clearly "substantial" under the relevant factors discussed in *Halberstam*. *Id.* at 483-84 (listing six factors). First, through its assistance, Twitter encouraged ISIS's ongoing program of international terrorism; murderous terror attacks were not only foreseeable, but known and expected to become ever more frequent and deadly. Second, Twitter provided a sophisticated and extremely useful communication platform to ISIS for free over the course of several years, including tens of thousands (if not more) Twitter accounts that played a major role in ISIS's terror activities, including recruitment, growth, image-building, fundraising, terror, and intimidation. Third, as in *Halberstam*, Twitter's presence or absence at the scene of the attacks is insignificant given that Twitter is a corporation and given the nature of Twitter's Services. Fourth, Twitter itself characterizes its relationship with registered users as being based

6

upon a contract, license, or agreement subject to terms, policies, and guidelines that govern the relationship. Fifth, as in *Halberstam*, "it defies credulity that [Twitter] did not know that something illegal was afoot," when it was providing its services to ISIS. *Id.* Lastly, Twitter provided its Services to ISIS, its followers, and affiliates for years, despite repeated complaints and pleas to block ISIS from its platform. Taken together, these factors clearly demonstrate that Twitter's assistance to ISIS has been extensive and substantial.

Accordingly, Twitter's motion to dismiss Count I of the FAC should be denied.

### 2.  Twitter Conspired with ISIS

As discussed, Twitter's challenge to Plaintiffs' ATA conspiracy claim (Count II) is also premised upon Twitter's flawed reading of the term "person" in § 2333(d). Twitter also asserts that there are no allegations that it "had any agreement with *anyone* underlining the attacks." (MTD at 13) (underlining added). But Twitter's narrow arguments are contrary to § 2333(d) and *Halberstam*, and miss the mark.

"The prime distinction between civil conspiracies and aiding-abetting is that a civil conspiracy involves an agreement to participate in a wrongful activity." *Halberstam*, 705 F.2d at 487. "Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Id.* at 477 (citing W. Prosser, Law of Torts Sec. 46, at 292 (4th ed. 1971); 16 Am. Jur. 2d Conspiracy § 68 (1979)). Moreover, "courts have to infer an agreement from indirect evidence in most civil conspiracy cases." *Id.* at 486.

Conspiracy liability can be based upon an agreement to do (a) an unlawful act, or (b) a lawful act in an unlawful manner, and "a conspirator can be liable even if he neither planned nor knew about the particular overt act that caused injury, so long as the purpose of the act was to advance the overall object of the conspiracy." *Id.* at 487. As mentioned, Twitter itself characterizes its relationship with registered users as based upon a contract, license, or agreement. In addition, Twitter's knowledge of ISIS's terrorist character, and its pattern of knowingly allowing ISIS accounts to remain open and active over the course of years, provide evidence of Twitter's tacit agreement to provide services and resources to ISIS—in violation of federal law—to promote and carry out its terrorist activities. (¶ 555). The terror attacks that killed the victims were "reasonably foreseeable consequence[s]" of agreeing to provide support and resources illegally to ISIS. *See Halberstam*, 705 F.2d at 487. Plaintiffs sufficiently state a claim for conspiracy under the ATA.

### B.  Twitter is Directly Liable to Plaintiffs Pursuant to 18 U.S.C. § 2333(a)

### 1.  Twitter's Unlawful Acts Meet the Definition of International Terrorism

7

Regarding Counts III and IV ("direct" ATA claims), Twitter first contends that the FAC does not allege that Twitter committed an act "international terrorism" as defined by 18 U.S.C. § 2331(1). Specifically, Twitter argues that its conduct was not "violent" or "dangerous," nor did its action "appear to be intended" to intimidate, coerce, or influence civilians or governments as set out in § 2331(1)(A) and (B). (MTD at 13).

As discussed, Twitter <u>does not contest</u> the sufficiency of the FAC's allegations that witter violated §§ 2339A-B by knowingly providing material support to ISIS. Most courts that have addressed this issue have held that violations of §§ 2339A-B satisfy the ATA's definition of "international terrorism" in §§ 2331 and 2333. *See Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1015 (7th Cir. 2002) ("*Boim I*") ("If the plaintiffs could show that defendants violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of 'international terrorism' under sections 2333 and 2331); *Linde v. Arab Bank, PLC*, 97 F. Supp. 3d 287, 322 (E.D.N.Y. 2015) ("Completing a wire transfer generally cannot be described as 'violent' or 'dangerous to human life' in the colloquial sense. But … providing material support to a terrorist organization is an act 'dangerous to human life.' … The same is true for the requirement that the act 'appear to be intended' to intimidate."); *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 426 (E.D.N.Y. 2013) ("Violations of Sections 2339B and 2339C are considered to be acts of 'international terrorism' under Section 2333(a)"); *Goldberg v. UBS AG*, 660 F. Supp.2d 410, 426-27 (E.D.N.Y. 2009) (same, collecting cases).

Indeed, providing material support to terrorist groups is "dangerous to human life." In enacting § 2339B, Congress specifically found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), § 301(a)(7), 110 Stat. 1247. Upholding § 2339B, the Supreme Court also explained that Congress intended to bar "any form of material support" to a designated FTO because "even seemingly benign support…bolsters the terrorist activities of that organization." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29, 36 (2010). Similarly, the Seventh Circuit in *Boim v. Holy Land Found. For Relief and Dev.*, 549 F.3d 685, 694 (7th Cir. 2008) (*en banc*) ("*Boim III*"), stated that donations to the FTO Hamas, "by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel." Thus, the Court in *Boim III* explained: "[G]iven such foreseeable consequences," when a donor knows the aims and activities of Hamas, "such

8

donations would 'appear to be intended … to intimidate or coerce a civilian population' or 'to affect the conduct of a government by … assassination,' as required by section 2331(1)." *Id.*

In *Brill v. Chevron Corp.*, 2017 WL 76894, *3-*4 (N.D. Cal. Jan 9, 2017), this Court found that Chevron's indirect payment of bribes to Iraqi dictator Saddam Hussein were too attenuated to terror attacks carried out by Hamas in Israel to make Chevron's acts "appear to be intended" to intimidate the civilian population in Israel. In contrast, in this case Twitter provided material support directly to the FTO ISIS, knowing that ISIS was using those resources to recruit, inspire, threaten, and carry out terrorist activities. Furthermore, the brazen and defiant manner in which Twitter has for years rebuffed criticism and calls for it to cease its illegal provision of material support and resources to ISIS—even justifying its actions with the response that "one man's terrorist is another man's freedom fighter"—cannot be ignored. Congressmen, terrorism and social media experts, journalists, and government commissions have derided Twitter's "dereliction" and "conscious failure" to ensure that ISIS and its operatives do not subscribe to and use its services. As the FAC shows, Twitter has even made policy decisions and taken proactive actions that would actually protect ISIS and other terrorists in their use of Twitter's Services, such as notifying users of government inquiries and refusing government access to the commercial analysis product Dataminr. These actions, combined with Twitter's deliberate violations of §§ 2339A-B clearly meet the definition of "international terrorism" under the ATA.

### 2. Plaintiffs Were Injured "By Reason of" an Act of International Terrorism

Twitter argues that Plaintiffs' "direct" ATA claims fail to adequately allege that Twitter's provision of material support or resources to ISIS was a proximate cause of their injuries. While courts until now have struggled with defining the outer boundaries of proximate cause in civil ATA cases, Congress has now weighed in on this issue via JASTA. By enacting JASTA, including the explicit statement that its purpose is to provide civil litigants the "broadest possible basis, consistent with the Constitution," to recover from those who provide material support or resources to terrorists "directly or indirectly," Congress has clearly endorsed a more relaxed "indirect" proximate cause standard. JASTA § 2(a)(6) and (b).

Even prior to JASTA, courts recognized that Congress did not intend to require a proximate causation standard that would thwart the purpose of the ATA. In *Boim III*, the Court held that "[a]nyone who knowingly contributes to [even] the nonviolent wing of an organization that he knows to engage in

terrorism is knowingly contributing to the organization's terrorist activities," and is liable for those activities. 549 F.3d at 698. Most other courts have defined proximate cause in ATA cases in terms of foreseeability of the harm caused. For example, in *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. at 432, the Court recognized that "the Second Circuit in *Rothstein* [*v. UBS* AG, 708 F.3d 82 (2d Cir. 2013)] held that the phrase 'by reason of' [in § 2333(a)] requires that Plaintiffs show that their damages were proximately caused by Defendant." However, as *Rothstein* did not define the term, the *Strauss* Court explained that "[a]s the term is 'ordinarily used,' proximate cause requires a showing that Defendant's actions were 'a substantial factor in the sequence of responsible causation,' and that the injury was 'reasonably foreseeable or anticipated as a natural consequence.'" *Id.* (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)).

Whereas in *Rothstein* the court held that "proximate cause" was not satisfied when a defendant provided currency to Iran because it was not shown that this act made it more likely that Iran would supply money to the FTO that carried out the attacks, the Court in *Strauss* held "proximate cause" was satisfied where Hamas victims alleged that the defendants had provided money to Hamas charity front groups. *Strauss*, 925 F. Supp. 2d at 432-35. *Strauss* explained that providing material support to organizations controlled by Hamas is no different than providing material support directly to Hamas for purposes of the ATA, and "the social services provided by Hamas and its front groups are integral to building popular support for its organization and goals, which then facilitates its ability to carry out violent attacks." *Id.* at 434 (citing *Boim III*, 549 F.3d at 698). In addition, *Strauss* held that "plaintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter." *Id.*

More recently, *Linde*, 97 F. Supp. 3d at 324, addressing proximate cause under the ATA, concluded that "neither [*Rothstein* nor *O'Neill v. Al Rajhi Bank*, 714 F.3d 118 (2d Cir. 2013)] held that but-for causation is a requirement of the ATA." *Linde* also rejected a "but-for" causation requirement, pointing to "Congress' intent to impede terrorism by 'the imposition of liability at any point along the causal chain of terrorism,'" plus the fact that such a standard would make it impossible for victims of terrorist attacks to hold supporters of terrorist groups liable, and would thus "eviscerate the civil liability provisions of the ATA." *Id.* at 326. *Linde* agreed with *Strauss* and found proximate cause to be satisfied if it could be inferred that the defendant's material support "was a substantial reason that Hamas was able to perpetrate the terrorist

10

1  attacks at issue, and that Hamas' increased ability to carry out deadly attacks was a foreseeable consequence"

2  of providing such material support. *Id.* at 328-29.

3       The FAC alleges detailed facts showing Twitter provided material support to ISIS, and detailing

4  ISIS's extensive use of Twitter's platform and resources for years to carry out essential functions of the

5  organization and its terrorist activities. These resources strengthen ISIS internally as an organization as well

6  as externally. Plaintiffs provided specific examples of how ISIS and its affiliates used Twitter leading up to,

7  in the course of, and after the Paris and Brussels attacks that killed the victims in this case. ISIS used Twitter

8  to bolster their terrorist operations and make such attacks more likely, and more effective in intimidating the

9  civilian population in France and other countries and encouraging followers to carry out attacks. Plaintiffs

10  have thus sufficiently alleged proximate causation, and Twitter's challenge is without merit.

11  **IV.      THE CDA DOES NOT AFFORD IMMUNITY TO TWITTER IN THIS CASE**

12       **A.  The CDA Does Not Bar the ATA Claims**

13       As discussed, Congress enacted JASTA, including its findings and directives, for the express purpose

14  of providing civil litigants with the "broadest possible basis consistent with the Constitution of the United

15  States," to recover against providers of material support to terrorists. JASTA § 2(b). Insofar as the CDA is

16  inconsistent with this most recent expression of Congress' intent, the CDA should not apply, or should be

17  narrowly construed to allow recovery against Twitter for providing material support to ISIS.

18       The portion of the CDA raised by Twitter (47 U.S.C. § 230(c)(1)) is only implicated by claims that

19  "treat" Twitter as the "publisher" or "speaker" of a third party's content. The CDA does <u>not</u> provide

20  general immunity for Twitter's violation of federal criminal statutes that bar providing material support or

21  resources to terrorists or Plaintiffs' ATA claims.[2] Twitter's violations of §§ 2339A-B do not depend upon

22  the <u>content</u> that ISIS or its operatives post, nor do Plaintiffs' claims depend on characterizing Twitter as the

23  publisher or speaker of ISIS's content. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) ("courts

24

25  [2] *See* § 230(e)(1): "Nothing in this section shall be construed to impair the enforcement of … any … Federal

26  criminal statute." As the legislative history of the ATA and JASTA confirm, Congress intended the ATA to serve as a private means of enforcing the federal criminal antiterrorism statutes. FAC ¶¶ 2-7, 48-73. *See also*

27  *Halberstam*, 705 F.2d at 489 ("the implications of tort law as a supplement to the criminal justice process and possibly as a deterrent to criminal activity cannot be casually dismissed").

28

must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker'"). In this case, Twitter violated the federal criminal ban on providing material support or resources to the FTO ISIS. The FTO designation is based upon finding that the organization "is foreign, engages in 'terrorist activity' or 'terrorism,' and thereby 'threatens the security of United States nationals or the national security of the United States.'" *Holder v. Humanitarian Law Project*, 561 U.S. at 9 (quoting 8 U.S.C. § 1189(a)(1), (d)(4)). In upholding § 2339B, the Supreme Court stated the statute was justified by "the Government's interest in preventing terrorism." *Id.* at 36. The Court explained: "The material-support statute is, on its face, a preventive measure—it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *Id.* at 35. Sections 2339A-B apply broadly, and the duty they impose—and which Twitter breached—is not based upon Twitter's status or conduct as a "publisher or speaker"; rather, it is as a provider of material support or resources.

The material support that Twitter provides to ISIS need not include "publishing" services.[3] In addition to "service," the definition of "material support or resources" includes property (tangible and intangible), expert assistance (defined further as assistance derived from scientific, technical or other specialized knowledge), communications equipment, facilities, and personnel. § 2339A(b). *See e.g., U.S. v. Stewart*, 590 F.3d 93, 114-15 (2d Cir. 2009) (affirming § 2339A conviction for providing "personnel" by making imprisoned terrorist leader "available" to other terrorists via cellphone and messages). Knowingly providing any one of these forms of material support to ISIS violates §§ 2339A-B, independent of whether or how ISIS then makes use of the resource. For example, providing a license to ISIS to log-in and access the Twitter computer servers and platform constitutes provision of "material support" to ISIS in the form of "property" and "expert assistance." Refusing to provide such support to ISIS would not entail any "editorial" function, because Twitter has <u>no discretion</u> in the matter: providing such support is criminally prohibited. Once Twitter provides such support to ISIS in violation of §§ 2339A-B, Twitter is liable under § 2333(a) for any reasonably foreseeable injury that may result. The CDA does not immunize Twitter for

---

[3] *See Airbnb, Inc. v. City & Cty of San Francisco*, 2016 WL 6599821 (N.D. Cal. Nov. 8, 2016) (CDA did not apply to "booking" services, as distinguished from "publishing" services). Note that *Airbnb* involved a local ordinance and federal preemption, whereas this case involves federal statutes.

1    ISIS's subsequent use of the resources Twitter provided.[4]

2    **B.  The CDA Does Not Have Extraterritorial Application**

3    Twitter's reliance upon the CDA also fails because the CDA does not apply to conduct or causes of

4    action that arose outside the territorial jurisdiction of the United States. In this case, Twitter violated §§

5    2339A-B by providing resources to ISIS in Europe and the Middle East, and the terror attack and murder of

6    the victims occurred in Europe. Because all the relevant facts in this case occurred abroad, and Plaintiffs'

7    ATA claims arose abroad, Twitter's reliance upon the CDA immunity must fail.

8    The Supreme Court recently reaffirmed the "longstanding principle of American law 'that legislation

9    of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the

10   United States.'" *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010) (quoting *E.E.O.C. v.*

11   *Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (*Aramco*) (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285

12   (1949)). The Court said this principle is "a canon of construction, or a presumption about a statute's

13   meaning," which "rests on the perception that Congress ordinarily legislates with respect to domestic, not

14   foreign matters." *Id. See also Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (quoting *Microsoft*

15   *Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)) (this canon "reflects the 'presumption that United States law

16   governs domestically but does not rule the world'"). Accordingly, the Court in *Morrison* held that "'unless

17   there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect,

18   'we must presume it is primarily concerned with domestic conditions.'" *Id.* (quoting *Aramco* at 248).

19   Since the CDA "gives no clear indication of an extraterritorial application," under *Morrison*, the CDA

20   has no extraterritorial application. The CDA's text reinforces the presumption that Congress only intended

21   that it apply domestically, referring to interactive computer services "available to individual Americans,"

22   "the benefit of all Americans," and upon which "Americans" rely. 47 U.S.C. § 230(a)(1), (4), (5).

23   Accordingly, the CDA does not provide immunity for Plaintiffs' claims in this case.

24

25   ───────────────

     [4] By analogy, if one federal statute provided that "no seller of firearms should be treated as the shooter of a
26   firearm fired by a third party," and a second federal statute provided that "a gun dealer who sells a firearm
     to a convicted felon may be liable for any resulting injury," the first statute would not provide immunity to a
27   gun dealer who violated the second statute.

28

**C.  Twitter Functionality Assists ISIS in Conducting Terrorist Operations**

Twitter also provides proprietary functions that enhance ISIS's ability to conduct operations which are not "traditional publishing functions." Although Twitter has at times closed or suspended ISIS accounts, it has allowed ISIS to reconstitute these accounts, knowing that the original account either violated Twitter's rules or was illegal. FAC ¶566. When ISIS reconstitutes an account, the offending account holder creates a name that is a slight variation of the one taken down. This is critical to ISIS's use of Twitter and makes it easy for followers to reconnect. Twitter could easily detect such activity and refuse to allow such a name to be used. FAC ¶565. The refusal to allow usernames that are closely related to a username associated with an account has nothing to do with the content of the account. Certainly, the limiting the selection of a username is not "traditional publishing" activity.

Next, Twitter allows users to connect to other users in a bulk manner. FAC ¶577. This too is critical to ISIS's ability to reconstitute it accounts. Even if not reconstituting an account, it allows any newly created account to connect to hundreds or thousands of individuals in a very short period of time. *Id.* Allowing accounts to link to other accounts is a proprietary function of Twitter and is not publishing activity. More to the point, it is abnormal and suspicious for a newly created account to send out a large number of friend/follow requests immediately after account creation.

Both the incremental naming of accounts which have been taken down and the bulk friend/following requests are ***conduct*** that is easily detectable and prevented by Twitter. FAC ¶576. Twitter could disallow usernames too similar to a deleted account and limit the rate at which links to other accounts could be created. Neither of these limitations is content specific nor do they single out users. The effect of these restrictions, though, would be to substantially limit ISIS from using Twitter for terrorism.

**D.  Twitter is an Information Content Provider**

Courts have held that "a defendant is not entitled to protection from claims based on the publication of information if the defendant is 'responsible, in whole or in part, for the creation or development of [the] information.'" *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 409 (6th Cir. 2014) (citing 47 U.S.C. § 230(f)(3)). If "a website operator is in part responsible for the creation or development of content, then it is an information content provider as to that content—and is not immune from claims predicated on it." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).

14

With targeted ads, Twitter uses its knowledge about a viewer and the content the viewer is looking at to select ads to combine with posted content, creating a composite page specifically for that viewer. FAC ¶ 617-21. Twitter touts this feature and extracts a premium for such service. *Id.* Twitter becomes an information content provider when it crafts new content based upon each viewer's preferences, the content being viewed, and ads. *Id.* Twitter's conduct is entirely distinct from a website operator who "passively displays content that is created entirely by third parties," as the entire page that the viewer is experiencing is crafted and assembled strategically by Twitter. *See Fair Hous. Council v. Roommates.com, LLC,* 521 F.3d 1157, 1166-67 (9th Cir. 2008) ("Roommate is 'responsible' at least 'in part' for each subscriber's profile page, because every such page is a collaborative effort between Roommate and the subscriber"); *Blumenthal v. Drudge,* 992 F. Supp. 44, 50 (D.D.C. 1998) (where "there may be two or more information content providers responsible for material disseminated on the Internet -- joint authors, a lyricist and a composer, for example," CDA immunity would not apply). In *MCW, Inc. v. Badbusinessbureau.com, L.L.C.,* 2004 U.S. Dist. LEXIS 6678, *33 (N.D. Tex. Apr. 19, 2004), the court denied CDA immunity to a website that created and developed its own headings and titles on other parties' content, explaining: "[T]he titles and headings are clearly part of the web page content. Accordingly, the defendants are information content providers with respect to the website postings and thus are not immune from MCW's claims." Likewise, Twitter's actions of combining information from various sources constitute joint content creation.

Most importantly, no advertiser chooses to have its ads published with ISIS postings. That is a decision Twitter makes, rendering Twitter a content developer (provider). *See Roommates.com,* 521 F.3d at 1171 ("But if the editor publishes material that he does not believe was tendered to him for posting online, then he is the one making the affirmative decision to publish, and so he contributes materially to its allegedly unlawful dissemination. He is thus properly deemed a developer and not entitled to CDA immunity.").

## CONCLUSION

For the reasons set forth herein, Twitter's 12(b)(6) motion to dismiss is without merit and should be denied. Should this Court find Plaintiffs' FAC defective in any way, Plaintiff respectfully requests leave to amend. Under Fed. R. Civ. P. 15(a)(2) leave to amend should be "freely" granted when "justice so requires." *Foman v. Davis,* 371 U.S. 178, 182 (1962).

Dated: July 17, 2017

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC

By: /s Robert J. Tolchin
Robert J. Tolchin
(*Pro Hac Vice petition pending*)
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627
rtolchin@berkmanlaw.com

Attorney for Plaintiffs Anne Cameron Cain (Individually and as Representative of the Estate of Alexander Pinczowski), Beatriz Gonzalez (Individually and as Representative of the Estate of Nohemi Gonzalez), Jose Gonzalez, Jose Hernandez, Rey Gonzalez, and Paul Gonzalez


EXCOLO LAW, PLLC
Keith Altman
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
kaltman@lawampmmt.com

Attorney for Plaintiff Reynaldo Gonzalez

Case No. 3:17-CV-02506(JD)                    Plaintiffs' Opposition to Motion to Dismiss

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

----------------------------------------------------------------- X

ANNE CAMERON CAIN, individually and as representative on behalf of the Estate of ALEXANDER PINCZOWSKI;

BEATRIZ GONZALEZ, individually and as representative on behalf of the Estate of NOHEMI GONZALEZ; JOSE GONZALEZ; JOSE HERNANDEZ; REY GONZALEZ; PAUL GONZALEZ; and REYNALDO GONZALEZ,

Plaintiffs,

-against-

TWITTER, INC.,

Defendant.

----------------------------------------------------------------- X

Case No:
3:17-CV-02506(JD)

**ORDER DENYING
TWITTER'S MOTION TO
DISMISS**

Hon. James Donato

## ORDER

Upon consideration of Defendant Twitter's Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) and the parties' related pleadings and arguments, said motion is HEREBY DENIED.

Dated: _____, 2017

_____
Hon. James Donato
United States District Judge

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2017, I caused the foregoing Memorandum in Opposition to Twitter's Motion to Dismiss to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

By: /s Robert J. Tolchin
Robert J. Tolchin
(*Pro Hac Vice petition pending*)
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
718-855-3627
rtolchin@berkmanlaw.com

Dated:  July 17, 2017

Case No. 3:17-CV-02506(JD)                    Plaintiffs' Opposition to Motion to Dismiss