SETH P. WAXMAN (*pro hac vice*)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DOOR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

*Attorneys for Defendant*
**TWITTER, INC.**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ANNE CAMERON CAIN, BEATRIZ GONZALEZ, JOSE HERNANDEZ, REY GONZALEZ, PAUL GONZALEZ, and REYNALDO GONZALEZ<br><br>           Plaintiffs,<br><br>    v.<br><br>TWITTER, INC.,<br><br>           Defendant. | Case No. 3:17-CV-02506-JD<br><br>**REPLY MEMORANDUM IN SUPPORT OF TWITTER'S MOTION TO DISMISS THE AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)**<br><br>Judge: Hon. James Donato<br><br>[Fed. R. Civ. P. 12(b)(6)] |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...............................................................................................ii

ARGUMENT .....................................................................................................................1

I.      Plaintiffs Cannot Evade § 230's Robust Immunity ..............................................1

        A.      JASTA Did Not Impliedly Repeal § 230 ...................................................1

        B.      Section 230 Applies To Litigation Brought In The United States ...............3

        C.      Plaintiffs Impermissibly Seek To Punish Twitter For Publishing Third-Party
                Content ........................................................................................................3

        D.      Targeting Advertising Does Not Make Twitter A Content Provider ...........4

II.     All Of Plaintiffs' Claims Fail On Their Own Terms ............................................6

        A.      Plaintiffs Cannot Save Their Secondary Liability Claims ..........................6

        B.      Plaintiffs' Claims For Direct Liability Also Fail ......................................7

                1.      Twitter Did Not Commit An "Act of International Terrorism" ........7

                2.      Plaintiffs Fail To Establish Proximate Cause ..............................9

CONCLUSION ................................................................................................................ 10

CERTIFICATE OF SERVICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

Page(s)

## CASES

*Airbnb, Inc. v. City & Cty. of S.F.*, 217 F. Supp. 1066 (N.D. Cal. 2016)...................................4

*Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017)...................................9

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ...................................4

*Blumenthal v. Drudge*, 992 F. Supp. 44 (D.D.C. 1998)...................................5

*Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc)...................................8

*Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002)...................................8

*Branch v. Smith*, 538 U.S. 254 (2003) ...................................1, 2

*Brill v. Chevron Corp.*, 2017 WL 76894 (N.D. Cal. Jan. 9, 2017)...................................8, 9

*Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003) ...................................3

*Cohen v. Facebook, Inc.*, 2017 WL 2192621 (E.D.N.Y. May 18, 2017)...................................2, 3, 4

*Couch v. Cate*, 379 F. App'x 560 (9th Cir. 2010) ...................................9

*Doe v. Bates*, 2006 WL 3813758 (E.D. Tex. Dec. 27, 2006)...................................5

*Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008)...................................4

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc) ...................................5

*Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964 (N.D. Cal. 2016) ...................................3, 4, 10

*Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016) ...................................4, 10

*Goldberg v. UBS AG*, 660 F. Supp. 410 (E.D.N.Y. 2009) ...................................7

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ...................................6, 7, 8

*Hawaii v. Office of Hawaiin Affairs*, 556 U.S. 163 (2009) ...................................2

*Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010)...................................9

*Hui v. Castaneda*, 559 U.S. 799 (2010) ...................................2

*In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013) ...................................10

*Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016) ..........................................2, 5

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir. 2014) ..........................1, 5

*Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969 (2016) ....................................2, 10

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) .........................................................3

*MCW, Inc. v. Badbusinessbureau.com, LLC*, 2004 WL 833595 (N.D. Tex. Apr. 19, 2004) ..................5

*Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247 (2010) .........................................................3

*Morton v. Mancari*, 417 U.S. 535 (1974) ..................................................................................1

*Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, 1999 WL 558141 (S.D.N.Y. July 30, 1999) ..........6

*PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011) ............................................................................1

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976) ..........................................................1

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) .....................................................................9

*Ryan v. Hunton & Williams*, 2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ...............................7

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) ................................... 10

*United States v. 493,850.00 in U.S. Currency*, 518 F.3d 1159 (9th Cir. 2008) ...........................1

*Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) ................................4

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ...........................................................3

## STATUTES

18 U.S.C. § 2331 ...............................................................................................................8

18 U.S.C. § 2333 ..................................................................................................1, 6, 7, 10

18 U.S.C. § 2339A ............................................................................................................8

18 U.S.C. § 2339B ............................................................................................................8

47 U.S.C. § 230 .........................................................................................................1, 2, 3, 4, 5

Justice Against Sponsors of Terrorism Act, 130 Stat. 852 (2016) ...............................1, 2, 10

Plaintiffs' Opposition ("Opp.") confirms that Plaintiffs seek to hold Twitter liable for the Paris and Brussels terrorist attacks based solely on the ground that some of Twitter's hundreds of millions of users allegedly posted objectionable material on Twitter's platform.  While Twitter has profound sympathy for the victims of these crimes, the law does not permit such a theory of liability.  Plaintiffs' claims are barred by 47 U.S.C. § 230, and fail to meet the substantive requirements of the Anti-Terrorism Act ("ATA").

## I.       PLAINTIFFS CANNOT EVADE § 230'S ROBUST IMMUNITY

As Defendants have shown, § 230 bars claims that seek to hold an online service provider liable as a "publisher" of third-party content.  Plaintiffs do not dispute that Defendants are providers of "interactive computer service[s]" or that the allegedly harmful content at issue was supplied by third parties.  As explained below, the theories they do offer in an effort to evade § 230 all fail.

### A.       JASTA Did Not Impliedly Repeal § 230

Plaintiffs first argue, without citing a single case, that an uncodified statement of purpose in the recently enacted Justice Against Sponsors of Terrorism Act, 130 Stat. 852 (2016) ("JASTA"), somehow impliedly repealed the immunity provided by § 230. Opp 3-4, 11.  Plaintiffs are incorrect.

"It is 'a cardinal principle of statutory construction that repeals by implication are not favored.'" *United States v. 493,850.00 in U.S. Currency*, 518 F.3d 1159, 1167 (9th Cir. 2008).  An implied repeal may be found only where two statutes "are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'"  *Branch v. Smith*, 538 U.S. 254, 273 (2003); *see also Morton v. Mancari*, 417 U.S. 535, 551 (1974).  "[I]n either case, the intention of the legislature to repeal must be clear and manifest." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976).

No such manifest intent or irreconcilable conflict is present here.  Nothing in JASTA's text or history suggests any intent to override the established immunity that § 230 has provided for two decades— an immunity that repeatedly has been "understood to merit expansion … into new areas." *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 408 (6th Cir. 2014).  The operative provision added by JASTA states only that "liability *may be asserted* as to any person who aids and abets … or who conspires with the person who committed [the] act." 18 U.S.C. § 2333(d) (emphasis added).  It does not say that liability is *assured*—for example, by providing for liability "notwithstanding" existing immunities or defenses, including that provided to online service providers. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 621-622 (2011) (absence

of "*non obstante*" provision indicates legislature intended no implied repeal). JASTA's silence about § 230 or other immunities generally is particularly significant because the Act expressly—but only partially—curtailed a different immunity: namely, immunity of foreign sovereigns under the Foreign Sovereign Immunities Act ("FSIA") for certain acts of international terrorism. *See* JASTA § 3(a). That partial repeal of the FSIA powerfully suggests Congress meant to trim only that one immunity, not to repeal surreptitiously other immunities nowhere mentioned in JASTA itself or the debates preceding its enactment.

Nor does applying JASTA as written create an "irreconcilable conflict" with § 230. *Branch*, 538 U.S. at 273. JASTA permits secondary liability if its requirements are met and § 230 immunity applies if such claims seek to hold online providers liable for publishing third-party content, just as it does to any other type of claim. This is how statutory immunities always work: one law creates potential liability, and the immunity shields a defined class from that liability. In *Hui v. Castaneda*, for example, the Supreme Court rejected an argument that a later-enacted liability statute impliedly repealed an existing immunity, reasoning that no irreconcilable conflict was created merely because the older "more comprehensive immunity" would protect some defendants from liabilities created by the new law. 559 U.S. 799, 809-810 (2010).

The same reasoning governs here. Courts routinely apply § 230 to immunize service providers against claims arising under other federal statutes—including *later*-enacted statutes. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 22-23 (1st Cir. 2016) (§ 230 barred claims under Trafficking Victims Protection Reauthorization Act of 2008). Most directly on point is *Cohen v. Facebook, Inc.*, which applied § 230 to dismiss claims brought under JASTA, 2017 WL 2192621, at *3, *10-13 (E.D.N.Y. May 18, 2017)— in the face of the same implied-repeal argument Plaintiffs make here, *see* Opp. to Mot. to Dismiss at 27 n.6, *Cohen v. Facebook, Inc.*, No. 16-04453 (Jan. 13, 2017), ECF No. 29. This Court should do the same.

Plaintiffs' argument is especially weak because it relies not on JASTA's operative provisions, but on an uncodified statement of purpose. *See* Opp. 3. Such a "preamble[] cannot change the scope of [JASTA's] operative clause[s]," *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1978 (2016)—much less abrogate an immunity found in another, unmentioned statute, *see Hawaii v. Office of Hawaii Affairs*, 556 U.S. 163, 175 (2009) (rejecting implied repeal argument based on prefatory clause). And even that prefatory section states only that a plaintiff may "*seek* relief" for terrorism-related injuries, JASTA § 2(b) (emphasis added)—not that he will necessarily obtain it. JASTA did not silently repeal § 230's well-established immunity.

**B.  Section 230 Applies To Litigation Brought In The United States**

Plaintiffs erroneously argue that § 230 does not apply because their claims supposedly "arose abroad."  Opp. 13.  This argument was correctly rejected when Plaintiffs' counsel made it in *Cohen*, 2017 WL 2192621, at *13-15.  To determine whether to invoke the presumption against giving extraterritorial effect to federal law, a court must identify the "objects of the statute's solicitude."  *Morrison v. Nat'l Austl. Bank, Ltd.*, 561 U.S. 247, 267 (2010).  The "relevant location" for an immunity statute "is that where the grant of immunity is applied, *i.e.*, the situs of the litigation."  *Cohen*, 2017 WL 2192621 at *15; *see also Zeran v. Am. Online, Inc.*, 129 F.3d 327, 334 (4th Cir. 1997) (§ 230 "does not directly regulate the activities of interactive computer service providers" but rather "is addressed only to the bringing of a cause of action").  Section 230's application here is strictly domestic: it pertains to claims filed in a U.S. court, under U.S. law, against a U.S. company, by plaintiffs who are U.S. nationals.  *Cohen*, 2017 WL 2192621 at *15 ("the location of the relevant 'territorial events' or 'relationships' cannot be the place in which the claims arise but instead must be where redress is sought and immunity is needed"); *see also Morrison*, 561 U.S. at 267.  Plaintiffs do not cite a single case that has refused to apply § 230 on extraterritoriality grounds, and indeed, both the Ninth and D.C. Circuits have applied § 230 to claims involving content posted abroad.  *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1120-1121 (9th Cir. 2003); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1356-1357 (D.C. Cir. 2014).  This Court should follow *Cohen* in rejecting Plaintiffs' assertion of extraterritoriality.

**C.  Plaintiffs Impermissibly Seek To Punish Twitter For Publishing Third-Party Content**

Plaintiffs also are wrong that their claims neither "depend upon [ISIS-created] content" nor "treat" Twitter as a "publisher" of that content.  Opp. 11.  Plaintiffs variously characterize their claims as focused on allowing "ISIS to log-in and access" Twitter's "servers and platform," on letting ISIS "reconstitute" blocked accounts, or on permitting users to connect "in a bulk manner."  Opp. 12-14.  As explained (Mot. 10-11), these descriptions mischaracterize the FAC, which is "riddled with detailed descriptions of ISIS-related" content "disseminated through Twitter" and allegations "faulting Twitter for failing to detect and prevent th[at] dissemination."  *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 971 (N.D. Cal. 2016) ("*Fields I*").  The FAC plainly seeks to penalize Twitter for publishing third-party content—exactly what § 230 forbids.

In any event, even accepting Plaintiffs' descriptions would not remove Plaintiffs' claims from § 230.  "[W]hat matters" for § 230 immunity is not the "label[]" placed on the claim, but "whether the cause of

action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101-03 (9th Cir. 2009).  Courts have uniformly held that granting users access to a service provider's platform is publishing conduct protected by § 230, both in ATA cases—*see Fields I*, 200 F. Supp. 3d at 970-974; *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1123-27 (N.D. Cal. 2016) ("*Fields II*"); *Cohen*, 2017 WL 2192621, at *12-13—and in other contexts, *see Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 420-22 (1st Cir. 2007); *Doe v. MySpace, Inc.*, 528 F.3d 413, 421 (5th Cir. 2008). Section 230 bars such theories because they target a protected publishing decision: "the decision to permit third parties to post content." *Fields I*, 200 F. Supp. 3d at 972.

Plaintiffs insist that Twitter could have prevented account reconstitution and bulk follower requests in a content-neutral manner.  Opp. 14.  But even if that were true—and it is not—it would make no difference.  Any "attempt to draw a narrow distinction between policing accounts and policing content must ultimately be rejected," because a service provider's "choices as to *who* may use its platform are inherently bound up in its decisions as to *what* may be said on its platform." *Cohen*, 2017 WL 2192621, at *12 (emphasis added).  *Lycos* and *MySpace* make that clear, applying § 230 to claims premised on providers' failure to employ supposedly content-neutral strategies, such as barring users from having multiple screen names, *Lycos*, 478 F.3d at 420, and using age-verification tools, *MySpace*, 528 F.3d at 421-22.  The same is true here: Holding Defendants liable because they supposedly failed to block the use of certain account names or certain means of connecting to other users would penalize them for protected publisher activities.

This Court applied exactly this analysis in concluding that a local ordinance that fined Airbnb for accepting a fee for booking services did not trigger § 230.  *See Airbnb, Inc. v. City & Cty. of S.F.*, 217 F. Supp. 1066 (N.D. Cal. 2016).  The ordinance, this Court explained, "regulates [Airbnb's] own conduct as Booking Service provider[] and care[s] not a whit about what is or is not featured on [Airbnb's] websites." *Id.* at 1074.  By contrast, Plaintiffs' theories squarely target third-party content that Twitter allegedly failed to keep off its platform—as evidenced by the scores of allegations in the FAC highlighting precisely that content.  Such theories "'inherently require[] the court to treat' [Twitter] as a publisher or speaker of information provided by another," *id.* (quoting *Barnes*, 570 F.3d at 1102), and are therefore barred by § 230.

**D.  Targeting Advertising Does Not Make Twitter A Content Provider**

Likewise without merit is Plaintiffs' argument that § 230 does not apply because Twitter supposedly

acts as an "information content provider" by displaying "targeted ads" and a "composite page." Opp. 14-15. As explained (Mot. 7-8), a service provider does not "develop" content merely by "augmenting the content generally," *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (en banc)—even where (unlike here) it "has an active, even aggressive role in making available content prepared by others," *Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52 (D.D.C. 1998). Under controlling Ninth Circuit precedent, a provider loses immunity only "if it contributes materially to the alleged illegality of the conduct." *Roommates*, 521 F.3d at 1168. "[M]aterial contribution" means "being responsible for what makes the displayed content allegedly unlawful." *Jones*, 755 F.3d at 410.[1] No such facts are alleged here. Not only are any ads themselves third-party content, but Plaintiffs do not even suggest that they were objectionable or contributed to the alleged illegality of any terrorist content at issue. The use of "neutral tools" to place ads alongside third-party material, *Roommates*, 521 F.3d at 1171, does not defeat § 230 protection.

Moreover, Plaintiffs are wrong to suggest that this is a circumstance in which an online provider "publishes material that he does not believe was tendered to him for posting online." *Roommates*, 521 F.3d at 1171, quoted at Opp. 15. Advertisers provide ads to Twitter for the purpose of publishing them on Twitter's platform. Any decision about where to publish the ad was thus just as much a publishing decision—and is just as protected by § 230—as publishing any other type of third-party content. *See, e.g.*, *Backpage.com*, 817 F.3d at 22; *Blumenthal*, 992 F. Supp. at 51-52.[2]

---

[1] Plaintiffs' brief (Opp. 15) completely misreads this and other case law. The court in *Blumenthal* expressly rejected the argument that § 230 protection is limited to "passive conduit[s]," and held AOL immune even though it had solicited, paid for, and "affirmatively promoted" the allegedly defamatory third-party content. 992 F. Supp. at 51-52. In *MCW, Inc. v. Badbusinessbureau.com, LLC*, 2004 WL 833595, at *9-10 (N.D. Tex. Apr. 19, 2004), the court held the defendants acted as "information content providers" because they themselves had supplied titles and headers that were themselves defamatory. By contrast, the ads here were created entirely by third parties and are not alleged to be unlawful. Finally, the aspect of *Roommates* on which Plaintiffs rely involved a service provider that had designed its service to require users to submit content that allegedly violated federal law and then made "aggressive use" of that content in conducting its business. 521 F.3d at 1172. No such allegations are present here.

[2] Plaintiffs also suggest, in passing (at 11 & n.2), that § 230 does not apply because their claims reference federal criminal statutes. That argument is not only underdeveloped, but also flatly wrong. Courts have uniformly agreed that *civil* claims derived from federal criminal statutes fall outside the § 230's exception for "enforcement" of any "Federal criminal statute," 47 U.S.C. § 230(e)(1). *See, e.g.*, *Backpage*, 817 F.3d at 23; *Doe v. Bates*, 2006 WL 3813758, at *21 (E.D. Tex. Dec. 27, 2006).

1

II.    **ALL OF PLAINTIFFS' CLAIMS FAIL ON THEIR OWN TERMS**

2

    A.    **Plaintiffs Cannot Save Their Secondary Liability Claims**

3

    <u>Aiding and Abetting</u>.  Several independent defects further doom Plaintiffs' aiding and abetting claim.

4

At the threshold, Plaintiffs have not shown that Twitter aided the "person[s] who committed" the attacks,

5

as § 2333(d) requires.  Plaintiffs do not dispute (Opp. 4-7) that Twitter did not knowingly or substantially

6

assist any of the 15 individuals who the FAC alleges "directly" committed the attacks.  FAC ¶¶ 412, 463-

7

464, 469.  Instead, Plaintiffs contend they need only allege assistance to *ISIS*.  Opp. 4-7.  But their

8

Opposition points to no allegations establishing that ISIS, as an organization, "committed" the attacks,

9

rather than merely "planning" or "authorizing" them.[3]  And the text of § 2333(d) makes clear that assisting

10

(or conspiring with, *see infra* p. 7) an organization that "plans" or "authorizes" an attack is not enough.

11

    Even apart from the question of who "committed" the attacks, the FAC fails to establish the

12

requisite knowledge.  *Halberstam v. Welch* requires *both* that Twitter was "generally aware" of its role in an

13

illegal scheme "at the time" it provided assistance and, separately, that Twitter provided "knowing

14

assistance" to the "principal violation."  705 F.2d 472, 477, 487-488 (D.C. Cir. 1983).  Those requirements

15

were met in *Halberstam* because the defendant had lived for five years with the man who carried out the

16

illegal scheme, had witnessed ongoing and direct evidence of his criminal behavior, and had acted "as

17

banker, bookkeeper, recordkeeper, and secretary … in an unusual way under unusual circumstances."  *Id.* at

18

486-487.  The FAC, by contrast, does not allege that Twitter knew any particular user was a member of ISIS

19

or was engaged in illegal behavior "at the time" Twitter was providing services to the user.  At most,

20

Plaintiffs argue that Twitter made its services generally available to millions of users, while being generally

21

aware that some among them may have been affiliated with ISIS.  Opp. 6-7.  That is insufficient.  *E.g.*,

22

*Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) ("liability for

23

aiding and abetting 'require[s] actual knowledge of the primary wrong' by the defendant").

24

    Nor can Plaintiffs establish that the assistance Twitter allegedly provided was "substantial."  "It has

25

long been recognized that substantial assistance means more than just a little aid"—among other things,

26

---

27

[3] Indeed, Plaintiffs' brief never cites the FAC in its aiding and abetting section, and it cites the FAC only

28

once (Opp. 7) in addressing other aspects of their fact-intensive ATA claims.  The Court should not excuse this failure to provide the Court any guidance through the 125-page, 663-paragraph FAC.

1  there must be "a desire to help th[e] [illegal] activity succeed." *Goldberg v. UBS AG*, 660 F. Supp. 410, 425

2  (E.D.N.Y. 2009) (quotation marks omitted).  Although Plaintiffs cite *Halberstam*, they try to dilute its six-

3  factor test (Opp. 6-7), and also ignore its clear requirement that an aider and abettor have acted in some

4  deliberate way to help the actual perpetrator.  *See* 705 F.2d at 484, 488 ("state of mind" factor focuses on

5  whether the defendant had "a deliberate long-term intention to participate in an ongoing illicit enterprise"—

6  that is, an "intent and desire to make the venture succeed").  Plaintiffs do not suggest (nor could they) that

7  Twitter had any "desire" to help ISIS carry out its terrorist mission, that it knowingly worked with ISIS over

8  an extended period of time, or that it did anything to encourage ISIS to engage in terrorism.  Twitter's

9  alleged conduct is thus not remotely like the facts of *Halberstam*.  Courts have not hesitated to reject similarly

10  inadequate allegations of aiding and abetting.  *See Goldberg*, 660 F. Supp. 2d at 425 ("[D]efendant's alleged

11  actions in performing three wire transfers for [a primary Hamas fundraiser] fail to establish 'substantial

12  assistance'"); *Ryan v. Hunton & Williams*, 2000 WL 1375265, at *10 (E.D.N.Y. Sept. 20, 2000) (allegations of

13  a bank's "failing to shut down the accounts sooner" does "not rise to the level of substantial assistance").

14      <u>Conspiracy</u>.  The Opposition likewise fails to save Plaintiffs' conspiracy claim.  Plaintiffs do not

15  dispute that Twitter did not enter into any agreement with any of the 15 individuals who "directly"

16  committed the attack (FAC ¶¶ 412, 463-464, 469), or indeed with "*anyone* regarding the attacks," Opp. 7.

17  Instead, they argue that the Court should infer Twitter had an illegal agreement with ISIS generally.  Opp. 7.

18  That is not enough to satisfy § 2333(d)—especially given Plaintiffs' failure to point to allegations establishing

19  that ISIS "committed" the attacks, as opposed to having "planned" or "authorized" them, *see supra* p. 6.  But

20  even aside from that defect, Plaintiffs' conspiracy story fails in other ways.  Allegations that Twitter made its

21  services widely available to the public, that Twitter generally knew some persons affiliated with ISIS might

22  try to use those services, and that Twitter could have done more to prevent such users from posting content

23  simply do not amount to "indirect evidence" of an agreement "to participate in an unlawful act." [4]

24  *Halberstam*, 705 F.2d at 477.  Whether conspiracy liability can ever be established with proof of a tacit

25

26  [4] The Opposition asserts that Twitter "knowingly allow[ed] ISIS accounts to remain open," but that is not
   alleged in the single cited paragraph, Opp. 7 (citing ¶ 555), or even in any non-conclusory allegation in the

27  adjoining paragraphs, *see* FAC ¶¶ 552, 557 (faulting Twitter for not "proactively monitor[ing]" its platform).
   And even if Plaintiffs could point to any specific instance in which Twitter did not block a known ISIS-

28  account, that still would not show Twitter was ISIS's "willing partner." *Halberstam*, 705 F.2d at 486.

1    agreement (Opp. 7) is thus beside the point, because nothing that Plaintiffs allege plausibly suggests that

2    Twitter was a "willing partner" of ISIS (*Halberstam*, 705 F.2d at 486), or that it knowingly entered into an

3    agreement with ISIS with the *aim* of helping it carry out its unlawful terroristic objective.

### B.   Plaintiffs' Claims For Direct Liability Also Fail

#### 1.   Twitter Did Not Commit An "Act of International Terrorism"

6        As explained (Mot. 13-14), Plaintiffs' "direct" claims under the ATA must be dismissed because the

7    FAC's allegations do not satisfy at least two elements of the ATA's multi-part definition of "international

8    terrorism":  the requirements that Twitter's alleged conduct have been "violent" or "dangerous" and

9    "appear to [have] be[en] intended" to achieve a specified terrorist purpose.  18 U.S.C. § 2331(1).  Plaintiffs

10   respond by citing *Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002), for the proposition that they

11   need only allege a violation of the criminal material support statutes (18 U.S.C. §§ 2339A, 2339B) to

12   automatically meet the ATA's definition of "international terrorism."  Opp. 8-9.  But "*Boim* says no such

13   thing," as this Court rightly recognized in rejecting the very same argument in *Brill v. Chevron Corp.*, 2017 WL

14   76894, at *4 (N.D. Cal. Jan. 9, 2017) ("*Boim* indicates that § 2331(1)(B) [the "appear to be intended"

15   element] needs to be met in its own right as a required element of 'international terrorism.'").  As for the

16   out-of-district cases that Plaintiffs cite (Opp. 8), they misconstrue *Boim* and improperly disregard the plain

17   text of § 2331(1), which lists violation of a criminal law as only one element of "international terrorism."[5]

18       Far from imposing any kind of per se rule, the Seventh Circuit in its en banc decision in *Boim*

19   carefully distinguished between conduct that could and could not qualify as "international terrorism."

20   While the particular conduct in that case—knowingly giving large sums of money directly to Hamas—could

21   meet the definition, the Seventh Circuit explained that offering a *general* service to large numbers of people

22   would not, even if the provider of the service might expect terrorists to be among those who might receive

23   it.  *See Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc) (discussing Red

24   Cross); *see also* Mot. 14.  Likewise, in *Brill* this Court held that the plaintiffs' "non-conclusory allegations"

25   were insufficient to satisfy the "outward appearance requirement" of "international terrorism" because

---

27   [5] That Twitter chose to use the limited space in its motion to seek dismissal on *seven* other grounds, but not
28   based on the FAC's failure to establish a violation of §§ 2339A & 2339B, thus hardly warrants the attention
     that Plaintiffs devote to that choice.  Opp. 1-3, 8.

1  plaintiffs had alleged only that "Chevron should have, but didn't, take a harder look at the consequences of

2  its payments," rather than "that Chevron was a knowing and direct donor to Hussein." 2017 WL 76894 at

3  *3-4. The non-conclusory allegations in this case similarly establish, at most, that Twitter offered generic

4  services to hundreds of millions of users across the globe, some of whom may have used that service

5  improperly to express terrorist sympathies, and that Twitter might have done more to identify and block

6  specific users from posting such content. FAC ¶¶ 143, 537-540, 544-545. Such allegations are far removed

7  from the donations in *Boim* and from the kind of substantial, direct, and knowing assistance to terrorist

8  entities that have led courts to allow ATA claims premised on material support to proceed.[6]

9  ## 2.    Plaintiffs Fail To Establish Proximate Cause

10  Finally, as explained (MTD 14-15), the FAC's allegations are insufficient to establish that Twitter's

11  allegedly unlawful actions proximately caused Plaintiffs' injuries. Plaintiffs respond by urging this Court to

12  embrace a "relaxed" causation standard used by some out-of-district courts. Opp. 9. The Second Circuit

13  correctly rejected that argument in *Rothstein v. UBS AG*, explaining that the ATA's "'by reason of' language

14  had a well-understood meaning" drawn from identical language in RICO, which does not "permit recovery

15  on a showing of less than proximate cause, as the term is ordinarily used." 708 F.3d 82, 95 (2d Cir. 2013).

16  And in *Brill*, this Court agreed, holding that *Rothstein*'s "well-reasoned and compelling" "proximate causation

17  standard" "applies" to ATA claims. *Brill*, 2017 WL 76894, at *5. The "ordinary" meaning of a statutory "by

18  reason of" standard, *Rothstein*, 708 F.3d at 95, "turn[s]" not "on foreseeability"—as Plaintiffs argue (Opp. 9-

19  11)—but "on the existence of a sufficiently 'direct relationship'" between the defendant's allegedly unlawful

20  conduct and a plaintiff's injury. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 11-12 (2010); *Couch v. Cate*,

21  379 F. App'x 560, 565 (9th Cir. 2010) (discussing *Hemi Grp.*); *see also Brill*, 2017 WL 76894, at *5 (lack of

22  "direct[]" link doomed plaintiffs' causation theory). Plaintiffs' focus on foreseeability likewise conflicts with

23  recent Supreme Court authority confirming that "foreseeability alone does not ensure the close connection

24  that proximate cause requires." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017).

---

26  [6] Plaintiffs also assert that Twitter—by notifying users of government inquiries and declining to sell a data
analytics service to U.S. intelligence agencies—has "made policy decisions and taken proactive actions" that
27  protect ISIS's use of Twitter's services. Opp. 9; FAC ¶¶ 602-606. But nothing in the FAC suggests these
actions did not apply generally to all of Twitter's hundreds of millions of users or that Twitter took any of
28  these actions with any intent other than to protect its own and its users' First Amendment rights.

Plaintiffs further err in arguing that JASTA's "findings" somehow "endorsed" a "relaxed" causation requirement. Opp. 4, 9. JASTA did not amend the "by reason of" language in § 2333(a) and it did not purport to alter the causation analysis that phrase has long been understood to require. Moreover, as explained, JASTA's preamble cannot alter the meaning of its operative terms, *see Kingdomware*, 136 S. Ct. at 1978—let alone alter the meaning of operative terms in the ATA that JASTA left untouched.

In any event, Plaintiffs' claims fail even under their erroneous causation formulation. Nothing in the FAC plausibly suggests that Twitter's allegedly imperfect efforts to police its platform against use by terrorists in general "were 'a substantial factor in the sequence of responsible causation'" leading specifically to the Paris and Brussels attacks. Opp. 10 (quoting *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013)). Innumerable intervening actors and events—each a more proximate cause than Twitter of Plaintiffs' injuries—separate Twitter's allegedly unlawful conduct from the attacks: (1) Twitter allegedly failed to "proactively monitor" and thereby "block ISIS's use of" Twitter services (FAC ¶¶ 552, 557); (2) ISIS allegedly used those services to convey messages designed to recruit new members, raise funds, and spread propaganda (*id.* ¶¶172-300); (3) recipients of those messages allegedly responded by joining ISIS, contributing funds to ISIS, or paying more attention to ISIS (*id.* ¶¶ 229, 246); (4) those recruits, funds, and publicity allegedly helped ISIS grow into a larger terrorist organization (*id.* ¶¶ 172, 299); (5) all that somehow led the Paris and Belgium attackers to connect in some way with ISIS (*id.* ¶¶ 21, 353-362, 367-378); and (6) those individuals subsequently carried out one or both of the attacks, (*id.* ¶¶ 365, 412, 464). This "expansive" theory of causation is simply "too speculative [and] attenuated to raise a plausible inference of proximate causation." *Fields I*, 200 F. Supp. 3d at 974 n.4; *Fields II*, 217 F. Supp. 3d at 1127 n.3; *see also In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123-125 (2d Cir. 2013) (rejecting allegations that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda … proximately caused the September 11, 2001 attacks"). And were this Court to accept such a theory, the consequences would be staggering, exposing online providers to possible liability for "any ISIS-related injury without alleging any connection between a particular terrorist act and [the provider's services]." *Fields II*, 217 F. Supp. 3d at 1127. The doctrine of proximate cause cannot be stretched to such an extreme result.

## CONCLUSION

For all these reasons, Plaintiffs' FAC should be dismissed without leave to amend.

Dated: August 9, 2017

Respectfully submitted,

/s/ Patrick J. Carome
SETH P. WAXMAN (*pro hac vice*)
seth.waxman@wilmerhale.com
PATRICK J. CAROME (*pro hac vice*)
patrick.carome@wilmerhale.com
ARI HOLTZBLATT (*pro hac vice*)
ari.holtzblatt@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

MARK D. FLANAGAN (CA SBN 130303)
mark.flanagan@wilmerhale.com
WILMER CUTLER PICKERING
  HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

*Attorneys for Defendant*
**TWITTER, INC.**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2017, I electronically filed the above document with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By:  /s/ Patrick J. Carome
Patrick J. Carome